UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
IN ADMIRALTY

CASE NO. _____

FILED BY _MP_ D.C.

SEP 2 4 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

ROBERTA "BOBBIE" O'BRIEN,
MICHAEL O'BRIEN,
MEGHAN O'BRIEN,
MYCHAEL O'BRIEN LABRECQUE,
AND MICHAEL LABRECQUE,

Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD.,
d/b/a "Royal Caribbean Group,"
AND CAPTAIN JOHNNY FAEVELEN,

Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs hereby sue Defendants and allege:

### PARTIES

1. Plaintiff ROBERTA "BOBBIE" O'BRIEN ("Bobbie") is a 67-year-old United States citizen and resident of Georgia who is *sui juris*.

2. Plaintiff MICHAEL O'BRIEN ("Mike") is a United States citizen and resident of Georgia who is *sui juris* and the lawfully wedded husband of Bobbie O'Brien.

3. Plaintiff MEGHAN O'BRIEN ("Meghan") is a United States citizen and resident of Georgia who is *sui juris* and the adult daughter of Bobbie and Michael O'Brien.

- 1 -

Due to her Naval officer training and professional experience working with first responders, Meghan was uniquely positioned to observe and understand the systematic medical failures aboard the *Harmony of the Seas.*

4.  Plaintiff MYCHAEL O'BRIEN LABRECQUE ("Mychael") is a United States citizen and resident of Georgia who is *sui juris* and the adult daughter of Bobbie and Michael O'Brien. Mychael has cystic fibrosis, a genetic condition affecting the respiratory system, making her particularly vulnerable to respiratory infections and potential complications.

5.  Plaintiff MICHAEL LABRECQUE ("Michael") is a United States citizen and resident of Georgia who is *sui juris* and the lawfully wedded husband of Mychael O'Brien LaBrecque and son-in-law of Bobbie and Michael O'Brien. At all times material hereto, Michael was a fare-paying passenger aboard Defendant's vessel.

6.  Defendant ROYAL CARIBBEAN CRUISES LTD. d/b/a Royal Caribbean Group ("RCCL") is a foreign corporation incorporated under the laws of Liberia with its principal place of business located at 1050 Caribbean Way, Miami, Florida 33132. At all times material hereto, RCCL owned, operated, managed, maintained and controlled the passenger vessel *Harmony of the Seas.*

7.  Defendant CAPTAIN JOHNNY FAEVELEN ("Captain Johnny"), upon information and belief, is a foreign citizen who served as Master of the *Harmony of the Seas* at all relevant times. Captain Johnny is an experienced mariner with over 47 years of maritime experience, including 26 years under RCCL's employ, making his decision to sail with known safety equipment failures particularly egregious. Captain Johnny owns or has owned multiple properties in Florida, including real property in Pasco County currently listed for sale at $200,000, demonstrating systematic and continuous contacts with this forum. Upon information and belief, Captain Johnny has recently divested other Florida

properties while maintaining foreign residence in Norway. This Court has personal jurisdiction over Captain Johnny under Fed. R. Civ. P. 4(k)(2) based on his violations of federal maritime safety statutes while commanding the *Harmony of the Seas*. At the time of the tortious conduct in September 2022, Captain Johnny systematically commanded vessels calling at U.S. ports. His failure to comply with 46 U.S.C. § 30102(a)(1), which explicitly creates personal liability for vessel masters who violate federal safety requirements, constitutes tortious acts affecting U.S. passengers. While 46 U.S.C. § 3509 imposes duties on vessel owners regarding ACEP Guidelines compliance, Captain Johnny's knowing operation of a vessel that violated these requirements, combined with his personal liability under 46 U.S.C. § 30102(a)(1) for such violations, creates a sufficient basis for personal jurisdiction. These federal statutes establish Congressional intent to reach foreign masters who endanger U.S. passengers departing from U.S. ports.

## JURISDICTION

8. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under federal maritime safety statutes, specifically 46 U.S.C. §§ 3509 and 30102(a)(1), which create mandatory safety requirements for passenger vessels and provide direct federal remedies for violations thereof.

9. Defendant RCCL violated 46 U.S.C. § 3509, enacted January 1, 2021, as part of the Elijah E. Cummings Coast Guard Authorization Act of 2020, which mandates: "The owner of a passenger vessel to which this section applies shall ensure that the vessel is in compliance with the Health Care Guidelines for Cruise Ship Medical Facilities established by the American College of Emergency Physicians." These federally-mandated Guidelines require, among others, functional diagnostic equipment and adequate oxygen supplies — requirements

that were violated aboard the *Harmony of the Seas* during the October 2022 voyage.

10. This action arises directly under 46 U.S.C. § 30102(a)(1), which provides: "the owner and master of a vessel are liable for personal injury to a passenger or crew member caused by a neglect or failure to comply with part B or F of subtitle II of this title." The violations of 46 U.S.C. § 3509 alleged herein fall squarely within part B of subtitle II, creating direct federal statutory liability for both RCCL as owner and Captain Johnny as master.

11. The September 24, 2022 Coast Guard medical evacuations, documented in Exhibits A and B (USCG Case Nos. 1323258 and 1323249), established Defendants' actual knowledge of the vessel's inability to comply with federal requirements. As highlighted in Exhibit A, at 1925 hours on September 24, 2022, Captain Johnny made an extraordinary request: he asked Coast Guard rescue helicopters to "BRING OXYGEN" to supplement the vessel's depleted oxygen supplies—supplies that federal law mandates be sufficient for all passengers and crew. Exhibit B documents that Coast Guard personnel were forced to perform blood testing inside their helicopter because the vessel's Piccolo Xpress blood analyzer was non-functional, preventing diagnosis of the passenger's condition aboard the ship. These dual evacuations within hours of each other—both necessitated by equipment failures preventing compliance with 46 U.S.C. § 3509—provided Defendants unmistakable notice that their medical facility could not provide federally-mandated care.

12. Despite this actual knowledge, less than eighteen hours after Captain Johnny's oxygen request, Defendants made a calculated business decision: they embarked approximately 6,687 new passengers on September 25, 2022, without disclosing the medical facility's dangerous deficiencies or remedying the federal violations.

This conscious decision to operate in knowing violation of federal safety laws while concealing those violations from boarding passengers constitutes willful and wanton negligence.

13. Violations of federal maritime safety statutes constitute negligence per se under admiralty law, automatically establishing breach of the duty of care. *The Pennsylvania,* 86 U.S. 125 (1873); see also *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632 (1959) (establishing duty of reasonable care for vessel owners); *Chaparro v. Carnival Corp.,* 693 F.3d 1333, 1336 (11th Cir. 2012) (reaffirming shipowners' duty under federal maritime law). When a vessel violates safety regulations enacted to protect passengers, the violation establishes negligence as a matter of law if the plaintiff is within the protected class and the harm is of the type the regulation was designed to prevent. Moreover, willful violations of federal statutes—operating with actual knowledge of non-compliance—support punitive damages awards to deter conscious disregard for passenger safety. See *Exxon Shipping Co. v. Baker,* 554 U.S. 471 (2008) (recognizing punitive damages in maritime law); *Atlantic Sounding Co. v. Townsend,* 557 U.S. 404 (2009) (punitive damages available in general maritime actions).

14. Alternatively, this Court has original admiralty and maritime jurisdiction under 28 U.S.C. § 1333 as this case involves torts committed aboard a vessel on navigable waters. The Court also has diversity jurisdiction under 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the parties are completely diverse.

15. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any state law claims that form part of the same case or controversy as the federal statutory violations alleged herein.

16. This Court has personal jurisdiction over RCCL as a corporation conducting systematic and continuous business operations within Florida, maintaining its corporate headquarters in Miami, and operating vessels from Florida ports including Port Canaveral, Port Miami, and Port Everglades.

17. This Court has personal jurisdiction over Captain Johnny Faevelen pursuant to Fed. R. Civ. P. 4(k)(2) for claims arising under federal law, as he commanded a vessel calling at U.S. ports, violated U.S. federal maritime safety statutes, and has insufficient contacts with any single state to establish jurisdiction but sufficient contacts with the United States as a whole. Alternatively, Captain Johnny owns real property in Pasco County, Florida, currently valued at approximately $200,000, and has commanded vessels regularly calling at Florida ports for over 26 years, establishing systematic contacts with this forum.

## VENUE

18. Venue is proper in this district pursuant to the mandatory forum selection clause in RCCL's passenger ticket contract, which requires all claims arising from the cruise to be litigated exclusively in the United States District Court for the Southern District of Florida in Miami-Dade County, Florida.

19. Additionally, venue is proper under 28 U.S.C. § 1391(b)(1) as Defendant RCCL maintains its principal place of business at 1050 Caribbean Way, Miami, Florida 33132, within this district.

20. Venue is also proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to these claims occurred within this district, including:

    a. RCCL's corporate decisions, made at its Miami headquarters through real-time satellite communications with the vessel, to continue operations despite known federal violations;

b. RCCL's shoreside medical consultation and support services, operated from Miami, which failed to intervene despite knowledge of the vessel's medical equipment failures;

c. the vessel's systematic departures from and returns to Florida ports, including Port Miami and Port Everglades within this district;

d. RCCL's failure to investigate or remedy known safety violations, decisions made at its Miami headquarters; and

e. the ongoing harm to Plaintiffs caused by decisions emanating from RCCL's Miami headquarters.

**STATUTES OF LIMITATIONS AND CONTRACTUAL PROVISIONS**

21. This action is timely filed under multiple independent federal provisions. First, the federal three-year statute of limitations under 46 U.S.C. § 30106 governs all maritime personal injury claims. Second, 46 U.S.C. § 30527 voids any contractual provision limiting liability for personal injury caused by negligence, making RCCL's one-year limitation unenforceable. Third, claims arising from willful and wanton negligence are not subject to contractual limitation periods under binding *Yarmouth Castle* precedent. While RCCL's passenger ticket contract purports to require suit within one year, this limitation is void under federal law. Additionally, § 30102(b) provides that liability for federal safety violations is "not subject to limitation under any other provision of law," which arguably includes contractual limitations that would otherwise have legal effect. The incident occurred on October 2, 2022, making this complaint timely filed well within the applicable three-year federal period.

22. Even if any shorter limitation period applied, Defendants' fraudulent concealment tolls such limitations. RCCL concealed:

a. the September 24, 2022 dual Coast Guard evacuations;

     b.  Captain Johnny's oxygen request to the Coast Guard;

     c.  the complete scope of medical equipment failures; and

     d.  Bobbie O'Brien's complete medical records, which were not provided until September 2023 despite repeated requests beginning in November 2022.

Under established fraudulent concealment doctrine, limitations periods are tolled when defendants conceal material facts that plaintiffs could not discover through reasonable diligence. The doctrine prevents wrongdoers from benefiting from their own concealment of material safety violations.

23. Furthermore, the Discovery Rule applies to toll limitations until Plaintiffs knew or should have known of their injury's cause. Plaintiffs could not have known about the September 24th evacuations, Captain's oxygen request, or systematic equipment failures without access to Coast Guard records obtained through FOIA and discovery not available to passengers.

24. This case does not arise from medical malpractice claims. The ship's doctors and nurses attempted to provide care despite being given non-functional diagnostic equipment by Defendants. Rather, this case arises from Defendants' corporate decision to operate a vessel they knew violated federal safety statutes. As a matter of public policy, willful and wanton negligence based on violations of federal safety statutes cannot be subject to contractual limitation periods, as allowing such limitations would incentivize cruise lines to conceal safety violations until contractual deadlines pass.

25. The willful nature of Defendants' violations elevates this case beyond ordinary negligence. The Eleventh Circuit has established that willful and wanton negligence involves "intentional or wanton and reckless conduct" amounting to "a conscious disregard of the rights of others." *In re Amtrak Sunset Ltd.*, 121 F.3d 1421, 1428-29 (11th Cir. 1997).

- 8 -

26. In the seminal case of *In re Petition of Chadade Steamship Co. (The Yarmouth Castle)*, 266 F. Supp. 517 (S.D. Fla. 1967), this Court established that operating a vessel with known safety equipment failures constitutes willful negligence that cannot be contractually limited. In *Yarmouth Castle*, a cruise ship fire killed 90 passengers due to non-functional safety equipment and blocked emergency exits. The court held that when a vessel owner has actual knowledge of safety violations but continues operations, this conscious disregard for passenger safety constitutes willful and wanton negligence that pierces all contractual limitations and warranty disclaimers. The court specifically found that "no clause in a passage contract can relieve the carrier from liability for its own negligence" when safety equipment failures are known to the operator. To date, this is binding precedent in this District.

27. Here, like in *Yarmouth Castle*, Defendants had actual knowledge of safety equipment failures through the September 24th evacuations — including non-functional diagnostic equipment and depleted oxygen supplies requiring Coast Guard supplementation. Yet they consciously embarked approximately 6,000 new passengers without disclosure or remedy, demonstrating the same willful disregard for passenger safety that the *Yarmouth Castle* court found inexcusable.

## GENERAL ALLEGATIONS

28. At all relevant times, RCCL owned, operated, managed, maintained and controlled the passenger vessel *Harmony of the Seas*. At 1,188 feet in length and 227,000 gross tons, the *Harmony of the Seas* is longer than a Nimitz-class aircraft carrier and among the largest passenger vessels ever constructed. The *Harmony* carries up to 6,687 passengers and 2,200 crew members — nearly 9,000 souls whose safety depends on the vessel's medical facility when at sea.

29. All Plaintiffs were fare-paying passengers who boarded the *Harmony of the Seas* on September 25, 2022, at Port Canaveral, Florida, for what was marketed as a seven-day Western Caribbean cruise.

30. On October 2, 2022, Plaintiff Bobbie O'Brien nearly died aboard the *Harmony of the Seas* when the vessel's non-functional medical equipment prevented diagnosis and treatment of bilateral pneumonia, resulting in prolonged hypoxic respiratory failure that required emergency evacuation to Cape Canaveral Hospital.

31. What makes Defendants' conduct particularly egregious is that on September 24, 2022 — less than eighteen hours before Plaintiffs boarded — systematic failures of the vessel's safety equipment forced two separate Coast Guard medical evacuations. These evacuations provided Defendants unmistakable notice of the exact deficiencies that would nearly kill Bobbie O'Brien eight days later. The evacuations occurred during the prior week's voyage while the *Harmony* was following the identical seven-day Western Caribbean itinerary that the O'Brien family would embark upon the next morning.

32. The evacuations revealed non-functional diagnostic equipment, inoperable blood testing machines, and such critical oxygen depletion that Captain Johnny requested Coast Guard helicopters "bring oxygen" to the vessel. With at least eighteen hours' notice of their vessel's medical equipment failures — and approximately ten hours in port before the next embarkation — Defendants neither repaired the broken diagnostic equipment nor disclosed the safety violations to boarding passengers. Instead, they chose to conceal these federal violations and embark approximately 6,000 new passengers on the identical route with the same identical broken equipment that had just necessitated not one, but two federal rescue operations.

## STATEMENT OF FACTS

### Safety and Medical Requirements on Cruise Ships

33. To understand the magnitude of Defendants' violations and the preventable nature of Bobbie O'Brien's near-death experience, it is necessary to first examine the federal requirements and industry standards that should have protected the O'Brien family.

34. Modern cruise ships are marketed as "floating cities," but they are more accurately described as floating islands. The *Harmony of the Seas* is larger than a Nimitz-class aircraft carrier but carries twice as many people—nearly 9,000 passengers and crew. When emergencies arise at sea, whether fire, injury, or medical crisis, there is no calling 911, no outside emergency response, no nearby assistance. The ship's emergency systems and equipment become the sole barrier between crisis and catastrophe.

35. The Supreme Court recognized this unique vulnerability in *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959), holding that cruise lines owe passengers a duty of "reasonable care under the circumstances." For vessels carrying thousands of souls across hundreds of miles of open ocean, those circumstances demand extraordinary emergency preparedness—functioning safety equipment, operational emergency systems, and the capability to handle crises without outside assistance.

36. This duty of reasonable care has particular force and relevance when emergency equipment fails. Following the 1967 *Yarmouth Castle* disaster where failed safety equipment killed 90 passengers, federal courts established a critical principle. Non-functional emergency equipment constitutes willful and wanton negligence when cruise lines have notice of the deficiencies. The courts held that broken safety equipment is worse than no equipment at all—it creates a deadly illusion

of protection, leading passengers to believe help is available when the equipment
cannot actually perform its life-saving purpose.

37. Among the various emergencies that vessels must prepare for, medical crises
frequently arise when thousands of passengers spend days at sea. In 1995, the
American College of Emergency Physicians ("ACEP") published guidelines
defining minimum medical capabilities for cruise ships. For vessels carrying over
100 passengers, these voluntary ACEP Guidelines specified (among others):
functional X-ray imaging, laboratory blood testing equipment, multiple oxygen
delivery systems, cardiac monitors, nebulizers, and equipped overnight
observation areas. The guidelines required all equipment be maintained in
"functioning condition as required."

38. For 25 years, these ACEP guidelines remained voluntary industry standards,
with courts declining to mandate their adoption. This judicial restraint ended in
2014 when the Eleventh Circuit signaled a fundamental shift in cruise line
accountability. In *Franza v. Royal Caribbean*, 772 F.3d 1225 (11th Cir. 2014), the
court overturned decades of precedent that had allowed cruise lines to avoid
liability by claiming medical operations were handled by independent
contractors. The court noted that "the evolution of legal norms, the rise of a
complex cruise industry, and the progression of modern technology" demanded
greater accountability. Critically, the court recognized cruise lines' direct control
over shipboard operations and found they could be held vicariously liable for
their medical staff's actions—signaling that cruise lines can no longer distance
themselves from failures in medical services they provide to passengers.

39. *Franza*'s elimination of the contractor defense, combined with *Yarmouth Castle's*
treatment of broken equipment as willful negligence, created a powerful legal
framework: cruise lines could no longer escape liability through contractor

defenses (*Franza*) and broken equipment constituted willful and wanton negligence when they had notice (*Yarmouth Castle*). Together, these cases established that cruise lines bear full responsibility for maintaining functional equipment, regardless of who performs the maintenance.

40. This evolving framework—*Kermarec's* reasonable care standard, the principle that broken equipment violates that duty, voluntary but increasingly scrutinized ACEP guidelines, and cruise lines' expanded liability for shipboard operations under *Franza*—governed maritime safety through 2019. Courts applied these principles case by case, but stopped short of mandating specific medical capabilities for cruise vessels.

41. This patchwork of voluntary compliance and limited judicial enforcement would prove catastrophically inadequate when tested by a global pandemic. COVID-19 didn't just expose gaps in cruise ship medical preparedness—it revealed that voluntary standards could not protect thousands of passengers trapped at sea during a public health crisis.

42. In response, Congress enacted federal statutes that transformed reasonable care from a voluntary standard into mandatory law. While 46 U.S.C. § 3509 mandates ACEP Guidelines compliance with civil liability for violations, related provisions like 46 U.S.C. § 3507 carry criminal penalties for knowing violations of medical equipment requirements.

### Post COVID-19 Safety and Medical Requirements for Cruise Ships

43. COVID-19 arrived in the United States aboard cruise ships. In February and March 2020, vessels including the *Diamond Princess* and *Grand Princess* experienced outbreaks where hundreds of passengers and crew contracted the virus in confined spaces. Passengers were quarantined for weeks while the virus spread through ships whose medical facilities were wholly inadequate for

infectious disease outbreaks affecting thousands of people simultaneously. These events resulted in numerous deaths and required massive federal intervention to evacuate American passengers.

44. The scope of the crisis prompted unprecedented federal action. In March 2020, the Centers for Disease Control issued a "No Sail Order," halting all cruise operations from U.S. ports. The CDC documented that cruise ships played an "outsized role" in COVID-19 transmission, with multiple vessels experiencing outbreaks that revealed fundamental inadequacies in shipboard medical capabilities. The shutdown cost the cruise industry millions of dollars daily in lost revenue.

45. Industry executives acknowledged that existing medical standards had proven inadequate. In June 2020, Royal Caribbean and Norwegian Cruise Line co-commissioned the "Healthy Sail Panel" to develop enhanced health protocols that would satisfy regulators and allow resumption of operations. The Panel's September 2020 report stated that cruise ship medical facilities had been "fundamentally unprepared for infectious disease outbreaks" and recommended operators "increase the capacity in their onboard medical facilities" and "amplify the varieties and amount of equipment in the onboard medical facilities."

46. Congress responded with legislation that fundamentally transformed cruise ship medical requirements. Effective January 1, 2021, Congress enacted 46 U.S.C. § 3509 as part of the Elijah E. Cummings Coast Guard Authorization Act, converting voluntary industry guidelines into mandatory federal requirements. This statute, combined with existing safety requirements under 46 U.S.C. § 3507 (enacted in 2010 and carrying criminal penalties for non-compliance), marked a watershed moment in maritime law—medical preparedness was no longer a matter of industry discretion but Congressionally-mandated standard.

47. 46 U.S.C. § 3509 specifically mandates that cruise ship owners "shall ensure that the vessel is in compliance with the Health Care Guidelines for Cruise Ship Medical Facilities established by the American College of Emergency Physicians." This statute transformed the ACEP Guidelines—including requirements for functional X-ray equipment, laboratory testing capabilities, and adequate oxygen supplies, among others—from voluntary recommendations into mandatory federal requirements.

48. To resume operations after the industry shutdown, cruise lines were required to demonstrate compliance with these enhanced federal standards. Royal Caribbean publicly committed to meeting and exceeding the new requirements, implementing enhanced protocols for shore-based medical consultation. On its website and marketing materials, RCCL specifically represents to passengers that its medical facilities are "built, staffed, stocked, and equipped to meet or exceed guidelines established by the American College of Emergency Physicians." RCCL promises its ships carry "x-ray machines and processors, laboratory equipment" and that in medical emergencies, the company will "stabilize emergency patients and, when necessary, evacuate the patient to an appropriately equipped and staffed shoreside medical facility." These representations take on heightened legal significance given that ACEP Guidelines became federal law under 46 U.S.C. § 3509.

49. Under this new legal framework, vessel masters bear personal responsibility for ensuring compliance with federal medical equipment mandates before departing U.S. ports. Captain Johnny Faevelen, as master of the *Harmony of the Seas*, was required to verify that the vessel's medical facility met all federal requirements under 46 U.S.C. § 3509—requirements enacted specifically in response to the cruise industry's documented medical failures during the pandemic.

50. To ensure compliance with these enhanced standards, RCCL's corporate governance structure includes a Board-level Safety, Environment, Sustainability and Health Committee specifically tasked with reviewing "significant safety, environment and health incidents that impact the Corporation's guests." This Committee structure, combined with the International Safety Management Code ("ISM Code;" mandatory maritime regulations requiring vessels to report accidents and hazardous situations to company management), meant that any serious medical incidents would receive immediate corporate attention. RCCL publicly committed that its enhanced safety protocols would prevent the medical failures that had plagued the industry during COVID-19. These oversight mechanisms were not theoretical—medical evacuations, equipment failures, and passenger injuries trigger mandatory reporting up the corporate chain, ensuring executive awareness of any systemic deficiencies.

51. By September 2022, when the O'Brien family boarded the *Harmony of the Seas,* passengers could reasonably expect that the vessel's medical facility would comply with both traditional maritime safety requirements and the enhanced federal standards enacted in response to COVID-19. These expectations were based on federal law, RCCL's public commitments, and the understanding that vessels could not legally operate without meeting these requirements. No reasonable passenger would board a vessel knowing its medical facility could not provide the federally-mandated level of care, particularly given the enhanced public health vulnerabilities inherent in cruise ship operations that COVID-19 had so starkly exposed.

52. These enhanced legal obligations would be tested in the days immediately preceding the *Harmony's* September 24, 2022 departure, when specific events

demonstrated that the vessel was knowingly operating in violation of federal law.

**Immediately Prior to Subject Voyage**

53. Against this backdrop of mandatory federal requirements and RCCL's public safety commitments following the COVID-19 disasters, what transpired on the night of September 24, 2022 should have triggered immediate investigation and remedial action. Instead, it became a covered-up warning of the disaster that would nearly kill Bobbie O'Brien eight days later.

54. On the evening of September 24, 2022, while the *Harmony of the Seas* was completing its prior seven-day Western Caribbean cruise—the identical route the O'Brien family would embark upon the next morning—Captain Johnny faced an extraordinary medical crisis. Within hours, he would authorize two separate Coast Guard medical evacuations from his vessel—an exceedingly rare occurrence absent mass casualty events. U.S. Coast Guard Sector Miami, Search and Rescue Report, Case No. 1323249 (Sept. 24, 2022), obtained pursuant to 5 U.S.C. § 552; U.S. Coast Guard Sector Miami, Search and Rescue Report, Case No. 1323258 (Sept. 24, 2022), obtained pursuant to 5 U.S.C. § 552 (Exhibits A and B).

55. The United States Coast Guard is not a medical taxi service. Coast Guard resources are limited and reserved for true emergencies. Each helicopter evacuation costs taxpayers approximately $50,000 to $75,000 and risks the lives of rescue personnel. Dual evacuations from a single vessel in one night signal an extraordinary emergency that the ship's medical facility cannot handle.

56. At 1832Z (UTC) on September 24, 2022, Captain Johnny made his initial notification to the Coast Guard regarding a passenger with "suspected pulmonary embolism"—not diagnosed, but suspected. The use of "suspected" rather than "diagnosed" indicates the ship lacked functional diagnostic

capabilities to confirm the condition. The inability to confirm or rule out pulmonary embolism through chest imaging indicated the ship's X-ray equipment was non-functional.

57. At 1836Z, the Coast Guard briefed Coast Guard District Command Center (D7CC) and the Flight Surgeon who recommended medevac. At 1849Z, Station Lake Worth 45625 diverted for the medevac with 4 persons on board. At 1852Z, a conference call occurred between the shipboard doctor, the D7 Flight Surgeon, and D7CC to gather more information, establishing that medical professionals on both sides understood the severity of the equipment failures.

58. At 1925Z, after the initial evacuation request but before the Coast Guard arrived to hoist the first patient, Captain Johnny made a request that revealed the depth of the crisis: he asked the United States Coast Guard to "BRING OXYGEN." The official communication log documents: "1925Z SEP22: BRIEFED AIRMIA 65 PILOT ON FLT CEILING OF 1500FT, BRING OXYGEN." This meant the Coast Guard had to ensure they had extra oxygen onboard their helicopter before conducting the first evacuation. Coast Guard records confirm "extra oxygen o/b" (onboard), meaning federal rescue personnel had to supplement the ship's depleted oxygen supplies before they could even begin rescue operations. U.S. Coast Guard Sector Miami, Communication Log, Sept. 24, 2022 (Exhibit A).

59. This oxygen request is particularly damning. According to ACEP Guidelines mandated by 46 U.S.C. § 3509, vessels must maintain sufficient oxygen supplies including portable tanks and at least one oxygen concentrator. The *Harmony* should have maintained dozens of oxygen cylinders for nearly 9,000 passengers and crew. Captain Johnny's request for emergency oxygen from the Coast Guard proves either complete depletion or systematic failure of this most fundamental life-support equipment.

60. The second evacuation occurred at approximately 2017Z and involved a passenger with "possible stroke." According to Coast Guard records (Exhibit B), blood testing was performed by Coast Guard personnel inside their helicopter—a highly unusual procedure. Standard protocol calls for blood tests to be completed using the ship's laboratory equipment before evacuation. The fact that Coast Guard personnel performed these tests mid-flight proves the *Harmony's* blood testing equipment was non-functional.

61. Through these evacuations and the oxygen request, Captain Johnny had detailed knowledge that his vessel could not comply with federal safety requirements under 46 U.S.C. § 3509. The broken diagnostic equipment also prevented compliance with 46 U.S.C. § 3507, which requires vessels to maintain functional diagnostic equipment to document and treat sexual assault victims—requirements carrying criminal penalties including up to $250,000 fine and one year imprisonment for knowing violations under 46 U.S.C. § 3507(g)(2). Captain Johnny's 47 years of experience meant he understood that these equipment failures created potential criminal liability exposure.

62. RCCL maintains 24/7 satellite communication between vessels and its Miami headquarters. Medical evacuations require extraordinary operational coordination—altering course, adjusting speed, and navigating to specific helicopter rendezvous coordinates. These dual evacuations and unprecedented oxygen request would have been immediately reported to corporate executives pursuant to mandatory ISM Code requirements for reporting non-conformities and emergency situations. The operational disruption alone—delaying Port Canaveral arrival, consuming additional fuel, and coordinating Coast Guard assets—requires real-time notification to shore-based management.

63. The dual Coast Guard evacuations constituted precisely the type of "significant safety and health incidents" that RCCL's Safety, Environment, Sustainability and Health Committee was established to review. Yet despite these extraordinary events—including Captain Johnny's unprecedented oxygen request—the vessel sailed the next morning with identical deficiencies, suggesting either the Committee was not notified in violation of corporate governance protocols, or it chose to ignore its oversight responsibilities.

64. By 2200Z on September 24th, both evacuations were complete. The *Harmony* arrived at Port Canaveral at approximately 0600 on September 25th and did not depart until approximately 1700 that same day—providing eleven hours in port during which Defendants could have obtained replacement medical supplies from nearby Florida cities including Orlando (1 hour), Tampa (2 hours), Jacksonville (2.5 hours), or Miami (3.5 hours), attempted repairs, or cancelled the voyage if the equipment could not be made functional.

65. Yet despite having from 2200Z September 24th (when the evacuations ended) through 1700 September 25th—nearly 19 hours total—to address these life-threatening deficiencies, Defendants chose to do nothing. A cruise cancellation would have cost RCCL approximately $3-5 million in lost revenue and passenger compensation. Despite possessing actual knowledge that their vessel was operating in violation of federal safety statutes and could not provide basic life-sustaining medical care, Defendants made a calculated decision: rather than cancel the voyage and lose millions in revenue, they would conceal these violations from approximately 6,000 new passengers boarding the next morning, including the O'Brien family.

66. On September 25, 2022, at approximately 1100 hours, the O'Brien family arrived at Port Canaveral for their seven-day Caribbean cruise aboard the *Harmony of the*

*Seas.* They had no knowledge of the previous night's medical evacuations, the depleted oxygen supplies, or the broken diagnostic equipment. Had they known the vessel's medical facility could not perform basic diagnostic tests or maintain adequate oxygen supplies—deficiencies that had just necessitated two federal rescue operations—they never would have boarded.

67. The equipment failures documented on September 24th were identical to those that would nearly kill Bobbie O'Brien eight days later. The same non-functional X-ray that prevented diagnosis of suspected pulmonary embolism would prevent diagnosis of Bobbie's bilateral pneumonia. The same depleted oxygen requiring Coast Guard supplementation would force staff to ration oxygen between dying patients. The same failed blood testing equipment would produce hemolyzed samples when testing Bobbie's blood.

68. This decision to sail with known deficiencies constituted willful and wanton negligence. The medical system failures requiring emergency Coast Guard intervention on September 24th remained completely unrepaired when Bobbie O'Brien needed life-saving care. RCCL's decision to conceal these violations and proceed with the voyage elevates this case from ordinary negligence to conscious disregard for passenger safety.

### Subject Voyage

69. On the morning of Sunday, September 25, 2022—just hours after Captain Johnny had requested two separate Coast Guard medical evacuations—the O'Brien family boarded the *Harmony of the Seas* at Port Canaveral. They believed they were embarking on a seven-night Western Caribbean cruise featuring RCCL's advertised state-of-the-art facilities and all-inclusive care. The family had booked Concierge level accommodations, accessible only with special keycard access and offering reduced passenger density—one of several factors the family considered

when planning travel during the pandemic era, particularly given Mychael's cystic fibrosis. As passengers who had invested in premium accommodations and trusted RCCL's safety commitments, the O'Briens reasonably expected that the ship's medical facility would be fully functional and properly equipped.

70. Six days before embarkation, on September 19, 2022, RCCL's Suite Concierges had sent an email to Bobbie O'Brien stating "Your health & safety are our top priority" and directing the family to RCCL's health protocols that would "ensure you have a safe and healthy experience with us" (Exhibit F). This personalized safety assurance from RCCL's concierge staff reinforced the family's confidence that if RCCL was actively promising to prioritize their health and safety, the ship's medical facilities would certainly be prepared to handle any medical needs that might arise during the voyage.

71. Prior to boarding, all O'Brien family members were in good health with no underlying medical conditions requiring immediate attention. When Plaintiffs completed the required cruise documentation, including COVID-19 liability waivers acknowledging potential health risks of cruising during the pandemic, their decision to sign was based entirely on their reasonable reliance that RCCL had maintained the federally-mandated medical equipment the company had promised to provide. Had Plaintiffs known that RCCL was sailing with broken X-ray machines, non-functional blood testing equipment, and depleted oxygen supplies that violated federal safety laws, they would never have signed any waivers or boarded the vessel.

72. The COVID-19 waiver covered disease transmission risks, not RCCL's knowing violations of federal safety statutes. RCCL's conscious concealment of these federal safety violations while simultaneously obtaining COVID-19 waivers from passengers constituted fraudulent inducement that renders any such waivers

void and unenforceable. No reasonable passenger would assume health risks while trusting cruise line medical capabilities if they knew the cruise line was knowingly violating federal medical equipment requirements.

73. For the first five days, the O'Brien family enjoyed their cruise experience, participating in dining experiences and onboard activities, unaware that beneath the ship's luxury facade lay critically broken emergency infrastructure.

74. On the morning of September 30, 2022, Bobbie began experiencing flu-like symptoms, including shortness of breath, difficulty swallowing, ear aches, body aches, and general discomfort. In accordance with RCCL's COVID-19 policies, Bobbie reported her symptoms to the staff and was directed to the infirmary, accompanied by her husband Mike. She trusted that the vessel's medical center would provide the professional care that RCCL had repeatedly promised.

75. At the infirmary, Bobbie was tested only for COVID-19—no additional diagnostic testing was performed despite her respiratory symptoms. Dr. Unuvar prescribed two oral medications and released Bobbie to quarantine in her stateroom with assurances that she would "discharge to cabin, but remain in our care," creating expectations of continued medical monitoring that would prove false. RCCL's own medical records reveal the critical failure: despite Bobbie's obvious respiratory symptoms on September 30, 2022, staff marked "Chest X-Ray: Not Done" and "Pneumonia: No" in her file—documenting that no chest imaging was performed to rule out pneumonia, as shown below:

| REPORTED DATE<br>Sep 30, 2022 11:29<br>UTC-04:00 | Received Tamiflu: No<br>Pneumonia: No<br>Chest X-Ray: Not Done |
|---|---|

76. Throughout the afternoon of September 30th, Bobbie's condition rapidly deteriorated. Her throat swelled shut, constricting her airway and eliminating her ability to speak or swallow the prescribed oral medications. When Mike called the infirmary to report his wife's worsening condition and request different treatment, the staff's response was chilling: "there was nothing more that the infirmary or its staff could do." This admission reflected the tragic reality—with broken diagnostic equipment and depleted supplies, there truly was nothing more the medical team could do for seriously ill passengers.

77. At this critical juncture, the *Harmony* was docked at Labadee, Haiti—RCCL's private port facility where medical evacuation would have been possible. The same Captain Johnny who had authorized two evacuations on September 24th for "suspected" conditions now failed to evacuate Bobbie despite her confirmed deterioration. While her mother struggled to breathe, Meghan disembarked hoping to find over-the-counter medication at RCCL's shoreside facility, only to discover that RCCL had failed to stock even basic medical supplies at their own private port.

78. Meghan re-embarked and proceeded to walk all fourteen decks of the *Harmony*, visiting every store, desperately seeking any over-the-counter medication that could help her mother. Despite RCCL's extensive marketing of "all-inclusive care," basic items like Advil, cough drops, and allergy sprays were nowhere to be found. Based on her Naval training, Meghan was particularly shocked that a vessel larger than an aircraft carrier—carrying nearly 9,000 souls during a respiratory pandemic—lacked even the most basic over-the-counter remedies.

79. Throughout this crisis, the entire O'Brien family mobilized to find help. Despite Mychael's own vulnerability to respiratory illness due to her cystic fibrosis, she courageously checked on Bobbie and attempted to help her take medications that

Bobbie's swollen throat prevented her from swallowing. Michael and Mychael LaBrecque pleaded with RCCL's concierge staff for medical intervention and asked fellow concierge-level passengers if anyone had cough drops, lozenges, or nasal spray. The other passengers had nothing but suggested checking the ship's stores—reflecting the universal passenger belief that the *Harmony* would have "everything anyone could need."

80. By late afternoon of September 30th, Bobbie was in clear medical crisis. When Mike called the infirmary pleading for help, the medical staff refused for the second time that day. They would not send personnel to reassess Bobbie, insisting that "there was nothing more that the infirmary or its staff could do." This admission left the family to watch as Bobbie fought for her life without the medical support RCCL had explicitly promised and were required to provide.

81. During the terrifying night of September 30th, Meghan observed her mother's breathing become severely labored—shallow, rapid, and accompanied by an obvious struggle for oxygen. Her emergency response training told her this was respiratory distress requiring immediate intervention. When she called the ship's emergency number, no one answered. She called multiple times throughout the night. The emergency line that RCCL promised would connect passengers to "immediate medical evaluation" simply rang unanswered while Bobbie struggled to breathe.

82. Meghan maintained vigil through the night, watching her mother's respiratory distress worsen while the emergency line went unanswered. As someone trained in CPR, she faced an agonizing reality: she could recognize life-threatening symptoms but would be powerless if Bobbie's airway completely closed. The prospect of watching her mother die without any means of intervention—aboard

a vessel supposedly equipped for medical emergencies—created trauma that persists to this day.

83. Bobbie barely survived the night. By early morning of October 1, 2022, her throat had swollen completely shut. She could not speak, swallow water, or cough productively—effectively drowning in her own respiratory secretions. When Mike again begged the infirmary for help, they finally agreed to see her. Bobbie was transported via wheelchair, accompanied by Mike.

84. In the infirmary, without functional diagnostic equipment to identify Bobbie's actual condition, the medical staff resorted to blind treatment. Nurse Randy Mendoza and Dr. Unuvar administered three injections—hydrocortisone, ketorolac, and diphenhydramine—medications for allergic reactions and pain, not respiratory infections. Dr. Unuvar provided no notes or explanations for these drug choices. While Bobbie's bacterial pneumonia went undiagnosed and untreated, she received medications offering no meaningful benefit for her actual condition. She was then told to return to quarantine in her stateroom.

85. By the evening of October 1st, Bobbie had not consumed water for nearly 24 hours. Her breathing remained labored and shallow. When Meghan called the infirmary citing her mother's severe dehydration and need for intravenous fluids, the medical staff finally agreed to see Bobbie again. A staff member was sent to retrieve Bobbie for her third infirmary visit in two days—a pattern that demonstrated both the severity of her condition and the inadequacy of the ship's medical response. Bobbie would be transported via the ship's staff hallways, while Mike and Meghan would join Bobbie in the infirmary.

86. During transport to the infirmary, while being wheeled through the service corridor in visible respiratory distress, Bobbie encountered a senior RCCL officer wearing shoulder boards denoting command-level rank. This officer stopped,

observed Bobbie's condition, and inquired about her health. Despite personally witnessing a passenger in obvious medical distress — the same type of emergency that had triggered Coast Guard evacuations just seven days earlier — this command-level officer took no action to initiate evacuation protocols. This encounter establishes that RCCL's senior command personnel had direct, firsthand knowledge of Bobbie's life-threatening condition.

87. Upon arrival at the infirmary, the medical staff were visibly alarmed by Bobbie's critical condition and immediately admitted her. Mike and Meghan witnessed chaos that revealed the facility's complete dysfunction: staff scrambled to locate a working hospital bed, equipment was moved frantically between rooms, and personnel searched supply closets for basic medical equipment that should have been immediately available. The infirmary was essentially non-functional, completely unprepared to handle critically ill passengers.

88. The blood testing failures began immediately. At 2050 hours, Dr. Flores ordered both a CBC and Piccolo Xpress blood test. The CBC was marked "pending" and never completed. The first Piccolo Xpress attempt at 2101 failed, showing three critical values as "HEM" (hemolyzed) — including the C-reactive protein that would have revealed Bobbie's severe infection. Nurse Magdaraog was forced to draw blood a second time, then a third. During the third attempt, his frustration with the broken equipment caused an error that cut Bobbie's hand, causing blood to spill onto the floor. What should have taken 12 minutes according to the equipment manual stretched into hours of repeated failures.

89. While waiting for blood results that wouldn't come for hours, the ship's vital sign monitoring equipment provided dangerously false readings. At 2025 hours, Bobbie's oxygen saturation was recorded at 98% on room air. Yet 95 minutes later, at 2200 hours, she was documented in severe respiratory distress with actual

oxygen saturation of 89-91%, requiring emergency oxygen support. This medically impossible 9% drop without an acute event proves the pulse oximetry equipment was malfunctioning, masking Bobbie's true hypoxic state during critical hours.

90. Dr. Maria Flores attempted to provide care but was hampered by the facility's systematic failures. When she suggested administering injections, she appeared surprised to learn Bobbie had already received three that morning—information missing from the medical chart. When she proposed oral medication, she seemed confused when reminded that Bobbie couldn't swallow. This breakdown in basic record-keeping prevented coordinated care when Bobbie needed it most.

91. Without diagnostic capabilities, Dr. Flores told the family she suspected Bobbie was suffering from acute pneumonia, lung abscess, or severe infection, but admitted she could not confirm any diagnosis because "the subject vessel's X-ray machine and other diagnostic machines were not working." This admission—that the ship lacked the most basic diagnostic capability during a respiratory pandemic—represented the same equipment failure that had necessitated the September 24th evacuations.

92. The broken X-ray's impact becomes clear when contrasted with *Schuman v. Royal Caribbean Cruises, Ltd.*, Case No. 1:23-cv-24404-FAM (S.D. Fla.), where the same ship's X-ray successfully diagnosed bilateral pneumonia just two months later—proving RCCL could maintain functional equipment but chose not to during the O'Brien voyage.

93. Dr. Flores administered nebulizer treatment, but staff acknowledged they lacked properly fitting masks. The available masks interfered with oxygen delivery—critical for a patient in respiratory distress. Throughout the night, Mychael held the improperly-fitting mask on her mother's face, despite her own

- 28 -

cystic fibrosis making respiratory infections potentially fatal for her. This was the same inadequate respiratory equipment that had forced Captain Johnny to request Coast Guard oxygen just eight days earlier.

94. Without diagnostic results to guide treatment, the medical staff resorted to a shotgun approach. Between 2138 and 0329 hours, Bobbie received eight different medications: pain medication (ketorolac), respiratory treatments (acetylcysteine, albuterol, budesonide), an antibiotic (levofloxacin), a diuretic (furosemide), and anti-nausea medication (ondansetron). This chaotic drug administration—without knowing what they were treating—reflected the medical team's desperation.

95. The severity of Bobbie's condition required two physicians, with Dr. Ana Garrido recognizing how critically ill she had become. During nebulizer treatments, Bobbie coughed up enough mucus to fill an entire trash can—secretions indicating advanced pneumonia that functional X-ray equipment would have diagnosed 48 hours earlier. The overwhelmed medical staff left Meghan to handle these secretions without protective equipment.

96. As the medical team continued their work, Dr. Garrido delivered devastating news: when Mike asked if Bobbie could be driven to a hospital in Orlando, she said Bobbie "wouldn't make it"—she wouldn't survive the 30-minute drive. Yet despite this prognosis—far more critical than the "suspected" conditions that triggered immediate evacuations on September 24th—helicopter evacuation was never offered. Dr. Garrido promised medical records would be sent ahead to Cape Canaveral Hospital. This promise would prove false.

97. Given Dr. Garrido's prognosis that Bobbie was actively dying, the O'Brien family maintained continuous bedside vigil. Mychael, Michael, and Mike stayed with Bobbie while Meghan left the infirmary to pack their staterooms. Despite

Bobbie's critical condition, no RCCL staff offered to help with packing, provide transport assistance, or offer any support services standard during a medical emergency of this magnitude.

98. At approximately 1:30 AM on Sunday, October 2nd, an "ALPHA ALPHA ALPHA" call—a shipwide call signaling a medical emergency—suddenly blared through the infirmary. Without warning or instruction, the entire medical staff abandoned Bobbie and rushed out, leaving her alone with only her family. For approximately 30 minutes, the remaining O'Brien family members were left to monitor a critically ill patient with no medical training, no instructions, and no emergency equipment knowledge. If Bobbie had gone into respiratory arrest during this abandonment, her family would have watched her die. When staff finally returned, they brought the cardiac arrest patient with them. He was stationed in the room across the hallway from Bobbie.

99. The "ALPHA ALPHA ALPHA" announcement—a ship-wide emergency broadcast—necessarily alerted all personnel, including Captain Johnny, of a medical emergency requiring immediate response. Maritime protocol following such announcements requires assessment of the emergency and determination of appropriate response, including whether to increase speed, divert to nearest port, or arrange evacuation. Despite this actual notice of medical crisis at 1:30 AM, and despite having multiple response options available, Captain Johnny took no action to expedite medical care for any patient. The vessel maintained normal speed to Port Canaveral, extending the suffering of critically ill passengers for unnecessary hours.

100.  The oxygen crisis then began in earnest. At approximately 2:00 AM, Michael LaBrecque discovered that Bobbie's oxygen had stopped flowing. When he alerted the nurse, they found every single oxygen tank in the infirmary was

empty—the exact deficiency that had prompted Captain Johnny's September 24th request for the Coast Guard to "bring oxygen." For thirty minutes, Bobbie was without supplemental oxygen while staff scrambled to locate a single functioning tank among what should have been dozens of units for a vessel carrying nearly 9,000 souls. For a patient in hypoxic respiratory failure, thirty minutes without oxygen can cause irreversible brain damage or death.

101.    After thirty minutes of frantic searching, staff located a single functioning oxygen tank—one tank for an entire cruise ship at sea. With only two patients in the entire infirmary—Bobbie and the cardiac arrest patient—a nurse was forced to ration this sole oxygen source between them, running between rooms and manually switching supply every few minutes. This life-support triage, combined with medical alarms sounding for twenty minutes without response, demonstrated complete abandonment of emergency protocols. Meanwhile, the *Harmony* remained in waters where Captain Johnny had authorized immediate evacuations for less critical patients days earlier—yet evacuation was never offered for Bobbie.

102.    Not until 0405 on October 2nd—over seven hours after admission—did the medical staff finally obtain a complete blood reading. By then, the critical window for early intervention had passed, and Bobbie's condition had deteriorated beyond what shipboard treatment could address.

103.    On the morning of October 2, 2022 at approximately 0600, Bobbie was finally disembarked. Six ambulances waited at Port Canaveral for patients from the *Harmony*, revealing that Bobbie's near-death experience wasn't isolated but part of a mass medical emergency affecting multiple passengers. This was exactly what the September 24th evacuations had warned would happen if RCCL continued operating with broken equipment.

104.    Meghan watched her mother's evacuation from the family balcony while comforting two young relatives, ages four and two, who had witnessed their beloved "Grandma O'Bobbie's" near-death ordeal—the family's cruise vacation transformed into lasting medical trauma by RCCL's willful and wanton negligence.

105.    Cape Canaveral Hospital's immediate diagnosis revealed what the *Harmony's* broken equipment had concealed for days: bilateral pneumonia with prolonged hypoxic respiratory failure and dangerously elevated C-reactive protein levels indicating severe systemic inflammation. Hospital records documented Bobbie's oxygen saturation at 88-89% on room air upon arrival—levels incompatible with life without immediate intervention. The hospital was forced to perform a ventilation-perfusion (VQ) scan to rule out pulmonary embolism—an expensive nuclear medicine study costing $3,000-5,000—because RCCL's incomplete medical records failed to include the D-dimer test results that could have avoided this unnecessary procedure.

106.    The medical records RCCL promised never arrived intact. These records, printed at 0650 on October 2, 2022, completely omitted Bobbie's near-death experience (Exhibit C). This forced Cape Canaveral Hospital to attempt to save Bobbie's life while missing 24 hours of critical treatment data. A frustrated Cape Canaveral Hospital nurse was overheard asking: "How can we treat a patient when we don't know what she's been given?" RCCL's negligence continued endangering Bobbie even after evacuation, as the hospital accomplished in hours what the *Harmony* couldn't do in days—not through superior skill, but simply by having functional equipment.

107.    Bobbie required nearly a week of hospitalization in an isolation unit in order to recover from what should have been a treatable condition if diagnosed

promptly. The contrast was stark: proper diagnosis and treatment with working machines versus deadly delays caused by RCCL's equipment failures.

108.    The prolonged hypoxia Bobbie endured has left permanent damage that extends far beyond her week-long hospitalization. The human brain requires constant oxygen; when deprived, neurons begin dying within minutes and cannot regenerate. Bobbie's documented oxygen saturation of 88-89% for an extended period, combined with 30 minutes completely without supplemental oxygen at 2:00 AM, caused hypoxic brain injury. The damage manifests in persistent ways: her memory has gaps where there were none before, and tasks requiring sustained concentration leave her overwhelmed more quickly. Most significantly, her anxiety has become a constant, debilitating presence. She cannot swallow pills without fear, cannot sleep flat without panic, and experiences physical tremors when confronted with cruise imagery. Her blood pressure, previously controlled with minimal medication, now requires four times the previous dosage. For over two and a half years, her medical team has adjusted and readjusted prescriptions, searching for a combination that might restore her previous quality of life—a search that has proven futile. The independent, confident woman who boarded the *Harmony* on September 25, 2022, continues to fight through each day, but she does so while managing permanent neurological and psychological changes directly caused by RCCL's failure to maintain federally-mandated medical equipment.

109.    The psychological trauma compounds the physical damage. Bobbie now suffers from medically-documented PTSD, unable to swallow pills without terror of choking, unable to sleep flat without suffocation fears, and experiencing panic attacks triggered by maritime imagery. What should have been cherished family

memories of a luxury cruise have become sources of permanent trauma—lasting damage from RCCL's conscious decision to sail with known safety violations.

110.     The Subject Voyage exposed RCCL's promises of "meeting or exceeding" medical guidelines as fraudulent. Every equipment failure that nearly killed Bobbie—the broken X-ray, non-functional blood testing, depleted oxygen—had been exposed during the September 24th evacuations. RCCL gambled with passengers' lives to avoid voyage cancellation and federal scrutiny. Bobbie O'Brien nearly paid for that gamble with her life.

111.     The complete breakdown of RCCL's medical capabilities created a cascade of failures that nearly killed Bobbie and left her permanently damaged: non-functional X-ray prevented pneumonia diagnosis; malfunctioning pulse oximetry masked critical hypoxia; broken blood testing delayed infection detection; depleted oxygen supplies forced life-support rationing; and the denial of evacuation despite Dr. Garrido's acknowledgment that Bobbie was dying—all while the same Captain who had evacuated passengers for "suspected" conditions on September 24th refused evacuation for Bobbie's confirmed life-threatening crisis.

112.     The O'Brien family's ordeal extended long after Bobbie's hospitalization. Despite multiple requests beginning in November 2022, RCCL refused to provide complete medical records that might explain what had happened aboard the *Harmony*. Bobbie called repeatedly, as documented in Exhibit F. Family members made numerous attempts. For eleven months, RCCL withheld these critical documents. Not until September 26, 2023—nearly a year after the incident and just five days before the one-year statute of limitations cruise lines typically assert—did RCCL finally produce Bobbie's full medical records (Exhibit D). This calculated delay appears designed to prevent timely legal action, forcing the

family to pursue justice without understanding the full scope of RCCL's failures. The records, when finally produced, confirmed what the family had suspected: systematic equipment failures, missing documentation, and a pattern of negligence that began with the September 24th evacuations and culminated in Bobbie's near-death experience.

## COUNT I - WILLFUL AND WANTON NEGLIGENCE AGAINST ROYAL CARIBBEAN CRUISES LTD. FOR FAILURE TO FOLLOW 46 U.S.C. § 3509 AND RESULTING DAMAGES TO BOBBIE O'BRIEN

Plaintiff BOBBIE O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

113.    This Count is brought by Bobbie O'Brien pursuant to 46 U.S.C. § 30102(a)(1), which creates direct federal liability against vessel owners for passenger injuries caused by "a neglect or failure to comply with part B or F of subtitle II of this title." This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, 46 U.S.C. § 30527 voids any contractual provision limiting liability for personal injury caused by negligence. Additionally, Section 30102(b) provides that liability under this section is "not subject to regulation or limitation under chapter 305 of this title or to limitation of liability under any other provision of law." Moreover, contractual limitations cannot bar claims for willful and wanton negligence involving federal safety violations under binding *Yarmouth Castle* precedent.

114.    RCCL owed Bobbie O'Brien the duty to operate the *Harmony of the Seas* in compliance with 46 U.S.C. § 3509, which mandates that cruise ship owners "shall ensure that the vessel is in compliance with the Health Care Guidelines for

Cruise Ship Medical Facilities established by the American College of Emergency Physicians." These Guidelines require vessels carrying more than 100 passengers to maintain functional diagnostic equipment including X-ray imaging capabilities, laboratory testing for blood counts and chemistry, nebulizer capability, oxygen tanks with sufficient flow regulators, and adequate overnight patient care facilities—all of which were deficient or non-functional aboard the *Harmony* during the Subject Voyage, as demonstrated by the September 24th dual evacuations and systematic equipment failures witnessed by the O'Brien family.

115.  Specifically, RCCL violated multiple mandatory ACEP Guidelines including:

a.  **Guideline 8.1** requiring "X-ray imaging capabilities which includes one x-ray generator and one processing/developing system" — the *Harmony's* X-ray equipment was completely non-functional, preventing diagnosis of Bobbie's bilateral pneumonia, as documented in ship's medical records stating "Chest X-Ray: Not Done";

b.  **Guideline 5.16** requiring "Laboratory testing capabilities" including "Complete Blood Count (CBC)" and blood chemistry panels — the *Harmony's* Piccolo Xpress blood testing equipment was inoperable, producing hemolyzed, unusable samples during the September 24th evacuations (forcing Coast Guard to perform blood work mid-flight) and again on October 2nd when Nurse Magdaragog had to draw Bobbie's blood three times because the equipment could not produce a successful test result;

c.  **Guideline 5.1** requiring "pulse oximeter (SaO2)" with proper functionality — the *Harmony's* pulse oximetry equipment provided dangerously false readings, showing 98% saturation at 20:25 hours when actual saturation

was 89% just 95 minutes later, a medically impossible variation absent equipment malfunction;

d. **Guideline 5.10** requiring "Oxygen tanks (including portable tanks ≤ 5 liters) and at least one oxygen concentrator and a sufficient number of flow regulators" — the *Harmony's* oxygen supplies were so depleted that Captain Johnny requested Coast Guard helicopters "bring oxygen" on September 24th, staff were forced to ration the ship's only functioning oxygen tank between dying patients on October 2nd, and the vessel lacked the required oxygen concentrator that would have allowed them to generate oxygen and refill their tanks at sea;

e. **Guideline 5.8** requiring "Nebulizer capability" — the *Harmony* lacked proper nebulizer equipment, forcing medical staff to use inappropriate alternatives for Bobbie's respiratory treatment;

f. **Guideline 1.8** requiring "at least one (1) isolation room or the capability to provide isolation of patients" — the *Harmony* failed to properly isolate COVID-positive patients, forcing healthy family members as well as other critically ill passengers to share confined medical facility space with infectious patients during Bobbie's treatment;

g. **Guideline 5.17** stating "All medical equipment is maintained in accordance with recognized biomedical quality control recommendations" — the systematic failure of multiple critical systems simultaneously (X-ray, blood testing, oxygen, monitoring) evidences failure to maintain equipment per required standards;

h. **Guideline 3.5** requiring "When the ship is at sea, at least one physician and one additional clinical provider must be readily available to provide emergency medical care twenty-four hours a day" — the twenty-minute

delay in responding to cardiac alarms demonstrates failure to maintain required emergency response capability;

i. **Guideline 4.1.1** requiring "Well organized, legible and consistent documentation of all medical care" — the ship's inability to produce complete medical records for Bobbie's treatment, with critical documentation missing or incomplete, violates record-keeping requirements;

j. **Guideline 11.1** requiring "Comprehensive written medical contingency plan" for when "the primary medical facility become[s] non-operational" — the ship had no contingency plan when critical equipment failed, as evidenced by:

    i. no alternative diagnostic capability when X-ray failed;

    ii. no backup blood testing when Piccolo Xpress failed;

    iii. rationing oxygen between patients rather than accessing contingency supplies; and

    iv. no alternate care site despite medical facility overflow with multiple critical patients;

k. **Guideline 3.7** requiring "Ready access to both telephone and confidential email in order to communicate directly with shipboard and shoreside healthcare providers" — the medical staff's failure to consult with shoreside medical facilities or arrange evacuation despite Bobbie's deteriorating condition and non-functional equipment demonstrates failure to utilize required communication systems for obtaining higher-level medical direction.

116. RCCL's conduct constituted willful and wanton negligence—conduct undertaken with conscious disregard for passenger safety despite actual

knowledge of substantial risk of serious injury or death. The Southern District of Florida has long held that cruise lines cannot disclaim liability for such conduct regarding passenger health and safety. In re Chadade Steamship Co. *(The Yarmouth Castle)*, 266 F. Supp. 517 (S.D. Fla. 1967); *Chacon-Gordon v. M/V Eugenio "C,"* 1987 AMC 1886 (S.D. Fla. 1987).

117.    RCCL engaged in willful and wanton negligence through:

   a.   operating with non-functional X-ray and Piccolo Xpress blood testing equipment essential for diagnosing life-threatening conditions;

   b.   sailing with depleted oxygen supplies despite Captain Johnny's request that the Coast Guard "bring oxygen" during the September 24th evacuations;

   c.   continuing operations after these evacuations proved the medical facility violated federal requirements;

   d.   failing to investigate or remedy deficiencies during the vessel's port call between the September 24th evacuations and September 25th departure; and

   e.   concealing these federal safety violations from passengers while obtaining COVID-19 liability waivers.

118.    RCCL demonstrated conscious disregard for passenger safety by embarking more than 6,000 new passengers, including the O'Brien family, on September 25, 2022 — less than 18 hours after Captain Johnny was forced to request that United States Coast Guard rescue helicopters "bring oxygen" due to depleted shipboard oxygen supplies. RCCL had actual, real-time knowledge of these systematic failures through mandatory satellite communications between the *Harmony of the Seas* and RCCL's Miami headquarters, with Coast Guard records confirming both evacuations were reported to corporate emergency response teams.

119.     The convergence of *Franza* and *Yarmouth Castle* creates powerful precedent here. *Franza* established that cruise lines cannot escape vicarious liability for medical failures, while *Yarmouth Castle* held that broken safety equipment constitutes willful and wanton negligence when cruise lines have notice of deficiencies. Together, these precedents establish that RCCL cannot delegate away its duty to maintain functional medical equipment and bears direct liability for the known equipment failures.

120.     The causal connection between RCCL's violations and Bobbie's injuries is direct and undeniable. But for the broken X-ray equipment, her pneumonia would have been diagnosed within hours of her first medical visit on September 30th. But for the non-functional blood testing equipment, her infection markers would have been detected immediately. But for the depleted oxygen supplies, she would not have suffered thirty minutes without supplemental oxygen at 2:00 AM on October 2nd. Each equipment failure RCCL knew about from the September 24th evacuations directly caused Bobbie's deterioration from treatable respiratory infection to life-threatening bilateral pneumonia with hypoxic respiratory failure.

121.     As a direct and proximate result of RCCL's willful and wanton negligence in violating federal maritime safety statutes, Bobbie O'Brien nearly died from a treatable respiratory condition while aboard a vessel that federal law required to maintain functional diagnostic and treatment equipment. She suffered severe physical injuries, permanent organ and brain damage, substantial past and future medical expenses, and ongoing psychological trauma including inability to swallow pills and involuntary tremors when seeing cruise advertisements.

122.     The conduct described herein transcends ordinary negligence. RCCL's willful violation of federal safety statutes codified at 46 U.S.C. § 3509, undertaken with

actual knowledge of life-threatening medical equipment failures documented by the September 24th Coast Guard evacuations, constitutes the most egregious form of maritime misconduct. RCCL had actual, advance knowledge that their medical facility could not provide federally-mandated emergency care, yet made the calculated decision to embark 6,687 passengers the following morning. This conscious choice to endanger thousands of lives rather than cancel a profitable voyage represents willful and wanton conduct of the highest order, justifying substantial punitive damages.

123.    The need for punitive damages is particularly acute given the systemic nature of RCCL's conduct. The contrast between the non-functional equipment during Plaintiff's voyage and the fully operational equipment documented just two months later in *Schuman v. RCCL* proves that RCCL can maintain federally-required medical equipment but chose not to. Without substantial punitive damages, cruise lines will continue treating federal safety violations as acceptable business risks, calculating that profits from avoided cancellations exceed potential liability. Only significant punitive damages will make safety compliance more economical than willful violation.

**WHEREFORE,** Plaintiff BOBBIE O'BRIEN demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT II - WILLFUL AND WANTON NEGLIGENCE AGAINST CAPTAIN JOHNNY FAEVELEN FOR FAILURE TO FOLLOW 46 U.S.C. § 3509 AND RESULTING DAMAGES TO BOBBIE O'BRIEN

Plaintiff BOBBIE O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

124.    This Count is brought by Bobbie O'Brien pursuant to 46 U.S.C. § 30102(a)(1), which creates direct federal liability against vessel masters for passenger injuries caused by "a neglect or failure to comply with part B or F of subtitle II of this title." This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, that limitation does not bind Captain Johnny who is not a party to the passenger contract. Moreover, 46 U.S.C. § 30527 voids contractual provisions limiting liability for personal injury caused by negligence, and contractual limitations cannot bar claims for willful and wanton negligence under binding *Yarmouth Castle* precedent.

125.    Captain Johnny, as master of the *Harmony of the Seas* with 47 years of maritime experience, owed Bobbie O'Brien the duty to ensure the vessel operated in compliance with federal safety requirements before departing United States ports. While 46 U.S.C. § 3509 imposes duties on vessel owners, Captain Johnny's knowing operation of a vessel that violated these requirements creates liability under 46 U.S.C. § 30102(a)(1). His conduct constituted willful and wanton negligence—conduct undertaken with conscious disregard for passenger safety despite actual knowledge of substantial risk of serious injury or death. The Southern District of Florida has long held that such conduct cannot be excused through contractual provisions. In re *Chadade Steamship Co. (The Yarmouth Castle)*, 266 F. Supp. 517 (S.D. Fla. 1967).

126.    Captain Johnny breached his duties through:

    a.  personally authorizing the September 24th dual Coast Guard evacuations, thereby obtaining actual knowledge that the medical facility violated federal safety requirements;

    b.  specifically requesting the Coast Guard "bring oxygen," proving he knew the ship lacked basic life-support equipment;

    c.  sailing on September 25th despite this knowledge, with less than twelve hours in port to investigate or remedy the deficiencies;

    d.  failing to exercise his sole authority as master to refuse sailing until the vessel complied with federal law; and

    e.  concealing these violations from passengers and authorities while prioritizing his career over passenger safety.

127.    The principles in *Yarmouth Castle* apply with particular force here. As vessel master with actual knowledge of systematic equipment failures through the September 24th evacuations, Captain Johnny's decision to sail with broken medical equipment constitutes willful and wanton negligence that cannot be waived through contractual provisions.

128.    As master, Captain Johnny held a statutory obligation to ensure compliance with federal safety requirements under 46 U.S.C. § 3509 before sailing from a United States port. This duty exists independent of any seaworthiness obligations and arises from federal safety statutes that apply to all vessels, regardless of the passenger/crew distinction.

129.    The causal connection is clear and direct. Captain Johnny's 47 years of experience meant he fully understood the life-threatening consequences of sailing without functional medical equipment. But for his decision to sail on September 25th with actual knowledge of equipment failures, Bobbie would never have been exposed to the deficient medical facility that nearly killed her.

His personal authorization of the September 24th evacuations establishes both his knowledge of the deficiencies and his conscious disregard when allowing the O'Brien family to board hours later.

130.     As a direct and proximate result of Captain Johnny's willful and wanton negligence, Bobbie O'Brien nearly died from a treatable respiratory condition while aboard a vessel that federal law required to maintain functional medical equipment. She suffered damages as detailed in Count I, Paragraph 121, incorporated herein by reference, including permanent organ and brain damage, substantial past and future medical expenses, and severe psychological trauma.

131.     Captain Johnny's conduct deserves particular condemnation given his 47 years of maritime experience. His decision to sail on September 25, 2022, despite personally authorizing two Coast Guard evacuations less than twelve hours earlier, represents a conscious betrayal of his fundamental duty as master. His request that the Coast Guard "bring oxygen" during the evacuations proves he knew the ship lacked basic life-support equipment, yet he still welcomed 6,687 passengers aboard the next morning. This willful violation of 46 U.S.C. § 3509, undertaken with full knowledge of life-threatening consequences, justifies substantial punitive damages against Captain Johnny personally to ensure no ship's master ever again chooses corporate profits over passenger lives.

**WHEREFORE,** Plaintiff BOBBIE O'BRIEN demands judgment against Defendant CAPTAIN JOHNNY FAEVELEN. for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT III - VICARIOUS LIABILITY OF ROYAL CARIBBEAN CRUISES LTD. FOR CAPTAIN JOHNNY FAEVELEN'S WILLFUL AND WANTON NEGLIGENCE AND RESULTING DAMAGES TO BOBBIE O'BRIEN

Plaintiff BOBBIE O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

132. This Count is brought by Bobbie O'Brien under the doctrine of vicarious liability, which holds employers liable for the willful and wanton negligence of their employees acting within the scope of their employment. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106.

133. At all times material hereto, Captain Johnny Faevelen was an employee, agent, and servant of RCCL, acting within the scope of his employment as master of the *Harmony of the Seas* and under RCCL's direct control and supervision.

134. Captain Johnny's decision to sail on September 25th despite knowing the medical facility violated federal safety statutes demonstrates prioritization of RCCL's commercial interests over passenger safety. Voyage cancellations cost millions in refunds, rebooking, port fees, and reputational damage. His conduct—concealing federal violations from authorities, sailing after the September 24th evacuations proved the medical facility was dangerous, and failing to investigate or remedy deficiencies during less than twelve hours in port—directly benefited RCCL by maintaining profitable operations and avoiding federal scrutiny.

135. Captain Johnny's conduct constituted willful and wanton negligence as detailed in Count II of this Complaint. The doctrine of *respondeat superior* holds RCCL fully liable for this tortious conduct committed within the scope of his employment. His decision to sail with known medical equipment deficiencies was made in furtherance of RCCL's business interests—maintaining the scheduled itinerary, avoiding voyage cancellation costs, and preventing federal regulatory scrutiny that would impact RCCL's entire fleet.

136.    As Captain Johnny's employer, RCCL is vicariously liable for all damages proximately caused by his willful and wanton negligence. His breach of fundamental maritime duty occurred while acting as RCCL's agent and for RCCL's benefit, establishing clear vicarious liability regardless of whether his conduct resulted from explicit directives, implicit pressure, or internalized corporate culture.

137.    As a direct and proximate result of RCCL's vicarious liability for Captain Johnny's willful and wanton negligence, Bobbie O'Brien nearly died from a treatable respiratory condition. She suffered damages as detailed in Count I, Paragraph 121, incorporated herein by reference, including permanent organ and brain damage, substantial past and future medical expenses, and severe psychological trauma.

138.    RCCL's vicarious liability extends to punitive damages assessed against Captain Johnny for his willful and wanton conduct. Moreover, RCCL's apparent acceptance of Captain Johnny's decision to sail with known federal violations—evidenced by their failure to investigate the unprecedented dual evacuations despite 24/7 satellite communication—demonstrates corporate ratification of conduct that violated federal safety statutes. This ratification, combined with the systematic nature of the violations and RCCL's benefit from avoiding federal scrutiny, independently justifies punitive damages against RCCL to deter cruise lines from permitting their masters to prioritize commercial operations over passenger safety.

**WHEREFORE,** Plaintiff BOBBIE O'BRIEN demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## <u>COUNT IV - WILLFUL AND WANTON NEGLIGENCE AGAINST ROYAL CARIBBEAN CRUISES LTD. FOR FAILURE TO PROVIDE MEDICAL EVACUATION AND RESULTING DAMAGES TO BOBBIE O'BRIEN</u>

Plaintiff BOBBIE O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

139.     This Count is brought by Bobbie O'Brien pursuant to general maritime law and the duty of reasonable care owed to passengers. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, 46 U.S.C. § 30527 voids any contractual provision limiting liability for personal injury caused by negligence, and contractual limitations cannot bar claims for willful and wanton negligence under binding *Yarmouth Castle* precedent.

140.     RCCL owed Bobbie O'Brien the duty to provide appropriate medical evacuation when the vessel's medical facility was incapable of treating life-threatening conditions. The Eleventh Circuit recognizes cruise lines maintain control over evacuation decisions and must exercise reasonable care in making them. *Franza v. Royal Caribbean*, 772 F.3d 1225, 1236 (11th Cir. 2014). This Court has consistently found liability when cruise lines delay necessary evacuations, causing passenger injuries to worsen. This principle extends across circuits. *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1070 (9th Cir. 2001) (cruise line breached duty by failing to evacuate passenger with pneumonia). Moreover, RCCL's own website promises to "evacuate the patient to an appropriately equipped and staffed shoreside medical facility" when necessary—a promise made binding by the company's public representations to passengers.

141.    This duty is reinforced by the Eleventh Circuit's holding in *Smolnikar v. Royal Caribbean Cruises*, 787 F.3d 1308, 1316 (11th Cir. 2015), requiring "reasonable care under the circumstances" based on "the severity of the medical emergency and what the cruise line knew or should have known." Having evacuated a passenger for suspected pulmonary embolism on September 24th, RCCL's failure to evacuate Bobbie for confirmed life-threatening respiratory failure with severe hypoxia constitutes an egregious breach of their duty.

142.    The duty to evacuate becomes mandatory when the ship's own medical staff acknowledges inability to provide adequate care. Here, Dr. Garrido explicitly stated Bobbie "wouldn't make it" if driven to Orlando—an acknowledgment that her condition exceeded the ship's capabilities. Despite this medical assessment, and despite being within Coast Guard helicopter range (as proven by the September 24th evacuations), RCCL refused evacuation. RCCL had multiple opportunities to evacuate Bobbie: when she first presented with severe respiratory distress on October 1st; during the overnight crisis when she couldn't breathe; and during the early morning hours of October 2nd when Dr. Garrido acknowledged she was dying. At each juncture, RCCL chose corporate interests over passenger life. This stands in stark contrast to the September 24th evacuations for "suspected" conditions, revealing a pattern of selective evacuation based on non-medical factors.

143.    Upon information and belief, based on extensive research of maritime evacuation records, three medical evacuations from the same cruise ship within eight days is unprecedented absent mass casualty events and would have triggered immediate federal investigation. For a vessel carrying nearly 9,000 passengers, such investigation would have cost RCCL millions in potential delays, rebookings, and reputational damage. RCCL's conscious decision to let a

passenger suffer rather than face these consequences constitutes willful and wanton negligence—conduct undertaken with conscious disregard for passenger safety despite actual knowledge of substantial risk of serious injury or death.

144.    The stark contrast between the September 24th evacuations for "suspected" conditions and the denial of evacuation for Bobbie's confirmed life-threatening condition suggests non-medical factors influenced RCCL's decision. Discovery will reveal whether RCCL maintains internal protocols regarding evacuation decisions and what factors beyond medical necessity influence those decisions. Moreover, under RCCL's own governance structure, these evacuation decisions should have triggered review by the company's Safety, Environment, Sustainability and Health Committee, demonstrating that the denial of Bobbie's evacuation reflected corporate policy rather than individual medical judgment.

145.    RCCL breached its duties through:

    a.  failing to evacuate Bobbie despite her condition being more severe than the suspected pulmonary embolism evacuated on September 24th;

    b.  concealing the evacuation option while telling the family "there was nothing more the infirmary could do" without disclosing that helicopter evacuation remained available;

    c.  prioritizing avoidance of federal investigation over passenger life;

    d.  failing to take any available action to expedite medical care, including the cost-free option of increasing vessel speed to reach Port Canaveral faster, despite the ALPHA ALPHA ALPHA medical emergency announcement at 1:30 AM providing actual notice of the crisis; and

    e.  allowing Bobbie to suffer for over 48 hours with a condition shore facilities diagnosed and treated within hours.

146.    The disparate treatment proves this was a corporate decision, not medical

judgment. RCCL evacuated passengers with 'suspected' conditions but denied

evacuation for Bobbie's confirmed life-threatening hypoxia. Her doctor

acknowledged she wouldn't survive a 30-minute car ride, yet Cape Canaveral

Hospital—which ultimately diagnosed and treated her pneumonia within

hours—was less than 30 minutes by helicopter. The proximity of appropriate

medical care makes RCCL's denial of evacuation particularly egregious. The

causal connection is undeniable: but for RCCL's failure to evacuate, Bobbie

would have received timely diagnosis and treatment at Cape Canaveral Hospital,

avoiding the 30 minutes without oxygen at 1:30 AM, the prolonged hypoxia

causing permanent brain damage, and the near-death experience that has left her

with lasting PTSD.

147.    Upon information and belief, industry standard practice requires evacuation

when a ship's medical staff cannot provide definitive diagnosis or treatment for a

deteriorating patient. RCCL's deviation from this standard, particularly after

their medical staff admitted they could do nothing more, demonstrates conscious

disregard for accepted safety practices.

148.    The need for punitive damages is acute given RCCL's conscious decision to

deny evacuation despite evacuating passengers with less severe conditions just

days earlier. This disparate treatment, combined with Dr. Garrido's

acknowledgment that Bobbie was dying, demonstrates RCCL prioritized

avoiding federal scrutiny over saving a passenger's life.

149.    As a direct and proximate result of RCCL's willful and wanton negligence in

failing to provide medical evacuation, Bobbie O'Brien nearly died from a

treatable respiratory condition. She suffered damages as detailed in Count I,

Paragraph 121, incorporated herein by reference, including permanent organ and

brain damage, substantial past and future medical expenses, and severe psychological trauma.

**WHEREFORE,** Plaintiff BOBBIE O'BRIEN demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT V - WILLFUL AND WANTON NEGLIGENCE AGAINST CAPTAIN JOHNNY FAEVELEN FOR FAILURE TO PROVIDE MEDICAL EVACUATION AND RESULTING DAMAGES TO BOBBIE O'BRIEN

Plaintiff BOBBIE O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

150.    This Count is brought by Bobbie O'Brien pursuant to general maritime law and the master's duty of reasonable care owed to passengers. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. Captain Johnny, not being a party to RCCL's passenger ticket contract, cannot invoke any contractual limitations. Moreover, contractual limitations cannot bar claims for willful and wanton negligence under binding Yarmouth Castle precedent.

151.    Captain Johnny Faevelen, as master of the *Harmony of the Seas* with 47 years of maritime experience, owed Bobbie O'Brien the duty to provide appropriate medical evacuation when the vessel's medical facility was incapable of treating life-threatening conditions. This duty, grounded in fundamental maritime principles and the Eleventh Circuit's standard in *Smolnikar* requiring reasonable care based on known circumstances, was particularly clear given Captain Johnny's personal authorization of the September 24th dual evacuations,

- 51 -

including for a suspected pulmonary embolism. His subsequent denial of evacuation for Bobbie's confirmed respiratory failure with life-threatening hypoxia constitutes abandonment of his fundamental maritime duty.

152. Captain Johnny's failure to authorize evacuation was not based on medical judgment but on self-preservation. He knew that authorizing a third medical evacuation within eight days would trigger federal investigation into his vessel's systematic safety violations. Having sailed with broken medical equipment in violation of 46 U.S.C. § 3509—federal law enacted specifically after COVID-19 cruise ship disasters—Captain Johnny faced potential career-ending consequences including license suspension, personal liability, and destruction of his 47-year maritime reputation. This conscious choice to protect himself from professional ruin while allowing a passenger to suffer near-fatal consequences constitutes willful and wanton negligence—conduct undertaken with conscious disregard for passenger safety despite actual knowledge of substantial risk of serious injury or death.

153. Captain Johnny breached his duties through:

    a. denying evacuation for Bobbie's confirmed respiratory failure after personally authorizing evacuation for suspected pulmonary embolism on September 24th;

    b. concealing the evacuation option while allowing staff to tell the family "there was nothing more the infirmary could do";

    c. prioritizing avoidance of federal investigation over his centuries-old maritime duty to preserve human life at sea;

    d. failing to take even the cost-free option of increasing vessel speed after the ALPHA ALPHA ALPHA announcement at 1:30 AM; and

  e. allowing Bobbie to suffer for over 48 hours with a condition shore facilities would diagnose and treat within hours.

154. Captain Johnny's failure to act becomes even more egregious following the ALPHA ALPHA ALPHA announcement at approximately 1:30 AM on October 2nd. This ship-wide medical emergency broadcast provided actual notice of a life-threatening crisis in the medical facility. As master, Captain Johnny had multiple options: authorize helicopter evacuation as he had on September 24th, divert to a closer port, or at minimum, increase vessel speed to reach port faster. His failure to take even the cost-free option of increasing speed—which would have reduced hours of suffering—demonstrates conscious disregard for passenger safety.

155. Captain Johnny had sole and ultimate authority to order medical evacuation. His refusal to exercise this authority was the direct and proximate cause of Bobbie's continued deterioration. But for his conscious decision to deny evacuation, Bobbie would have received proper shore-based treatment days earlier, preventing her progression to bilateral pneumonia and near-fatal hypoxic respiratory failure.

156. As a direct and proximate result of Captain Johnny's willful and wanton negligence in failing to authorize medical evacuation, Bobbie O'Brien nearly died from a treatable respiratory condition. She suffered damages as detailed in Count I, Paragraph 121, incorporated herein by reference, including permanent organ and brain damage, substantial past and future medical expenses, and severe psychological trauma.

157. Captain Johnny's decision to let a passenger suffer near-fatal consequences rather than face personal scrutiny for his federal safety violations represents the most egregious breach of a master's duty in maritime law. A ship's captain who

chooses self-preservation over passenger life, particularly with 47 years of experience knowing the consequences, deserves substantial punitive damages to ensure no master ever again abandons their sacred duty to preserve life at sea.

**WHEREFORE,** Plaintiff BOBBIE O'BRIEN demands judgment against Defendant CAPTAIN JOHNNY FAEVELEN for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT VI - VICARIOUS LIABILITY OF ROYAL CARIBBEAN CRUISES LTD. FOR CAPTAIN JOHNNY FAEVELEN'S WILLFUL AND WANTON NEGLIGENCE IN FAILING TO PROVIDE MEDICAL EVACUATION AND RESULTING DAMAGES TO BOBBIE O'BRIEN

Plaintiff BOBBIE O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

158.   This Count is brought by Bobbie O'Brien under the doctrine of vicarious liability, which holds employers liable for the willful and wanton negligence of their employees acting within the scope of their employment. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, 46 U.S.C. § 30527 voids any contractual provision limiting liability for personal injury caused by negligence. Moreover, contractual limitations cannot bar claims for willful and wanton negligence involving conscious disregard for passenger safety under binding *Yarmouth Castle* precedent.

159.   At all times material hereto, Captain Johnny Faevelen was an employee, agent, and servant of RCCL, acting within the scope of his employment as master

of the *Harmony of the Seas* and under RCCL's direct control and supervision when making decisions regarding medical evacuations.

160.  Captain Johnny's denial of evacuation for Bobbie's confirmed respiratory failure while having authorized evacuation for suspected pulmonary embolism on September 24th demonstrates conduct protecting RCCL's commercial interests. Three medical evacuations within eight days would have triggered immediate federal investigation, voyage cancellation, and exposure of systematic violations costing millions in lost revenue and regulatory penalties. This disparate treatment—evacuating "suspected" conditions while denying evacuation for confirmed critical illness—directly benefited RCCL by avoiding federal scrutiny.

161.  RCCL maintained 24/7 satellite communication with the *Harmony* and had real-time knowledge of both the September 24th evacuations and Bobbie's deteriorating condition. By failing to intervene or override Captain Johnny's decision despite knowledge of the life-threatening situation, RCCL ratified his tortious conduct. This ratification occurred when RCCL, with full knowledge of the medical crisis through mandatory ISM Code reporting and the ALPHA ALPHA ALPHA announcement, chose not to exercise its authority to order evacuation, thereby adopting Captain Johnny's decision as its own. This provides an independent basis for liability beyond *respondeat superior.*

162.  RCCL is vicariously liable for Captain Johnny's complete failure to respond to the medical crisis despite actual notice. Following the ALPHA ALPHA ALPHA announcement at 1:30 AM, Captain Johnny—acting within the scope of his employment as RCCL's appointed master—refused to take any available action to expedite medical care, including the cost-free option of increasing vessel speed. This failure to implement even the most basic response to a ship-wide

medical emergency demonstrates RCCL's systemic disregard for passenger safety through its command personnel.

163.    Captain Johnny's conduct constituted willful and wanton negligence as detailed in Count V of this Complaint. The doctrine of *respondeat superior* holds RCCL fully liable for this tortious conduct committed within the scope of his employment and in furtherance of RCCL's business interests—avoiding federal investigation, preventing voyage cancellation, and protecting RCCL from liability exposure for violations of 46 U.S.C. § 3509.

164.    As Captain Johnny's employer, RCCL is vicariously liable for all damages proximately caused by his willful and wanton negligence. His breach occurred while acting within the scope of his employment and for RCCL's direct benefit, establishing clear vicarious liability regardless of whether motivated by explicit directives, implicit pressure, or internalized corporate culture.

165.    RCCL's vicarious liability extends to punitive damages for Captain Johnny's willful abandonment of his duty to evacuate. Furthermore, RCCL's failure to intervene despite 24/7 satellite communication and knowledge of the September 24th evacuations constitutes ratification of Captain Johnny's life-threatening decision, independently justifying punitive damages to deter cruise lines from allowing profits to override passenger survival.

166.    As a direct and proximate result of RCCL's vicarious liability for Captain Johnny's willful and wanton negligence, Bobbie O'Brien nearly died from a treatable respiratory condition. She suffered damages as detailed in Count I, Paragraph 121, incorporated herein by reference, including permanent organ and brain damage, substantial past and future medical expenses, and severe psychological trauma.

**WHEREFORE,** Plaintiff BOBBIE O'BRIEN demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT VII - GROSS NEGLIGENCE AGAINST ROYAL CARIBBEAN CRUISES LTD. FOR COMPREHENSIVE MEDICAL FACILITY FAILURES AND RESULTING DAMAGES TO BOBBIE O'BRIEN

Plaintiff BOBBIE O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

167.    This Count is brought by Bobbie O'Brien as an alternative theory of liability should the Court determine that RCCL's conduct, while egregious, does not meet the standard for willful and wanton negligence. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, 46 U.S.C. § 30527 voids any contractual provision limiting liability for personal injury caused by negligence.

168.    Even if the Court finds RCCL's conduct does not rise to willful and wanton negligence, the *Franza* decision establishes that RCCL cannot escape liability for its medical department's gross negligence. The systematic failure of multiple critical medical systems—X-ray, blood testing, oxygen supplies—represents a degree of negligence that shocks the conscience, particularly given RCCL's actual knowledge of these deficiencies from the September 24th evacuations.

169.    RCCL owed Bobbie O'Brien the duty to exercise reasonable care under the circumstances, including maintaining a medical facility capable of providing basic emergency medical care, particularly given the vessel's isolation at sea.

Gross negligence is conduct demonstrating reckless disregard of a legal duty and its consequences—a greater degree than ordinary negligence but not requiring the conscious disregard of willful and wanton negligence.

170. The Southern District of Florida in *Chacon-Gordon v. M/V Eugenio "C,"* 1987 AMC 1886 (S.D. Fla. 1987), established that medical equipment failures constitute gross negligence that cannot be disclaimed through contractual provisions. This binding precedent, combined with federal violations under 46 U.S.C. § 3509, creates an even stronger foundation for gross negligence liability.

171. RCCL engaged in gross negligence through:

    a.  operating with known non-functional X-ray, blood testing, and oxygen equipment;

    b.  continuing operations after the September 24th evacuations proved the medical facility was dangerously inadequate;

    c.  failing to implement any corrective measures during the port call before the O'Brien family boarded;

    d.  allowing oxygen to become so depleted that staff rationed life-support between patients;

    e.  maintaining a facility so deficient that six ambulances were required upon docking; and

    f.  operating the same vessel with functional X-ray equipment just two months later in *Schuman v. Royal Caribbean Cruises, Ltd.*, demonstrating RCCL's ability but conscious choice not to maintain equipment during the O'Brien voyage.

172. RCCL's gross negligence appears economically motivated. Upon information and belief, canceling the voyage for equipment repairs would have cost millions in lost revenue and passenger compensation. The decision to proceed with

known equipment failures suggests RCCL prioritized financial considerations over passenger safety.

173.    RCCL's gross negligence is particularly evident in its failure to take any action—not even increasing vessel speed—following the ALPHA ALPHA ALPHA medical emergency announcement at 1:30 AM on October 2nd. This inaction despite ship-wide notice of medical crisis demonstrates reckless disregard for passenger safety.

174.    RCCL's gross negligence is further evidenced by the operation of a medical facility serving more than 6,000 passengers that possessed less functional diagnostic capability than a four-person Coast Guard helicopter. While rescue helicopters performed diagnostic bloodwork in flight within minutes on September 24, 2022, RCCL's stationary medical facility required over seven hours—from approximately 9:00 PM on October 1st until 4:00 AM on October 2nd—to produce a single usable blood test result for Bobbie, after multiple hemolyzed samples failed. This seven-hour delay in obtaining basic bloodwork that a helicopter could perform mid-flight demonstrates catastrophic equipment failure and gross negligence.

175.    These failures represent not isolated incidents but systematic breakdown of medical infrastructure. The pattern of documentation failures is particularly damning: Dr. Unuvar provided "no notes or explanations" in ship records, critical information about oxygen deprivation was omitted, and Dr. Flores's shore referral (Exhibit E)—despite requesting pulmonology specialty care—left the "Brief History of Illness" and "Diagnosis" sections completely blank while describing only "severe sore throat" for a patient in life-threatening respiratory failure. This systematic absence of documentation across multiple physicians suggests either institutional direction to conceal the severity of medical crises or

such complete chaos that basic medical recording failed entirely. Either explanation demonstrates gross negligence and reckless disregard for passenger safety.

176.    The causal connection is clear. But for RCCL's reckless failure to maintain functional medical equipment despite warnings from the September 24th evacuations, Bobbie's pneumonia would have been timely diagnosed and treated. Had the X-ray been functional, Bobbie's pneumonia would have been visible on imaging on October 1st. Had blood testing equipment worked properly, infection markers would have been detected immediately rather than after seven hours of failed attempts. Had oxygen supplies been adequate, Bobbie would not have suffered the prolonged hypoxia at 1:30 AM that caused permanent injury. The comprehensive equipment failures directly caused her progression from treatable infection to life-threatening bilateral pneumonia with near-fatal respiratory failure.

177.    As a direct and proximate result of RCCL's gross negligence, Bobbie O'Brien nearly died from a treatable respiratory condition. She suffered damages as detailed in Count I, Paragraph 121, incorporated herein by reference, including permanent organ and brain damage, substantial past and future medical expenses, and severe psychological trauma.

**WHEREFORE,** Plaintiff BOBBIE O'BRIEN demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT VIII – NEGLIGENCE AGAINST ROYAL CARIBBEAN CRUISES LTD. UNDER GENERAL MARITIME LAW AND RESULTING DAMAGES TO BOBBIE O'BRIEN

Plaintiff BOBBIE O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

178.   This Count is brought by Bobbie O'Brien under general maritime law as a foundational claim should the Court find that RCCL's conduct constitutes ordinary negligence rather than gross or willful and wanton negligence. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, 46 U.S.C. § 30527 voids any contractual provision limiting liability for personal injury caused by negligence.

179.   At all times material hereto, RCCL owed Bobbie O'Brien a duty to exercise reasonable care under the circumstances. *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625 (1959). This duty arose from:

   a.   general maritime law imposing heightened duties on common carriers;

   b.   federal statutory requirements under 46 U.S.C. § 3509;

   c.   RCCL's contractual promises to meet ACEP Guidelines; and

   d.   RCCL's voluntary undertaking to provide enhanced medical capabilities following COVID-19.

180.   Following *Franza,* RCCL bears direct responsibility for all medical operations aboard its vessels. Upon information and belief, respiratory emergencies aboard cruise ships increased significantly post-COVID, making functional diagnostic equipment for conditions like pneumonia not merely foreseeable but statistically certain. Industry standard practice requires competing cruise lines including Carnival, Norwegian, and MSC to maintain functional X-ray equipment and adequate oxygen supplies as baseline medical preparedness.

181.   RCCL breached its duty through:

testing, oxygen, and records—would not occur without negligence in maintenance.

183.    The causal connection is direct. But for RCCL's failure to maintain functional X-ray equipment, Bobbie's pneumonia would have been diagnosed on October 1st. But for the broken blood testing equipment, her infection markers would have been detected. But for the depleted oxygen supplies, she would not have suffered life-threatening hypoxia. Each failure directly contributed to her deterioration from treatable infection to near-fatal bilateral pneumonia.

184.    As a direct and proximate result of RCCL's negligence, Bobbie O'Brien nearly died from a treatable respiratory condition. She suffered damages as detailed in Count I, Paragraph 121, incorporated herein by reference, including permanent organ and brain damage, substantial past and future medical expenses, and severe psychological trauma.

**WHEREFORE,** Plaintiff BOBBIE O'BRIEN demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages recoverable under the law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT IX – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ROYAL CARIBBEAN CRUISES LTD. FOR DAMAGES TO MICHAEL O'BRIEN

Plaintiff MICHAEL "MIKE" O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

185.    This Count is brought by Michael O'Brien under general maritime law for negligent infliction of emotional distress arising from RCCL's violations of federal safety requirements. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, 46 U.S.C. § 30527 voids

any contractual provision limiting liability for personal injury caused by negligence. The framework for this claim is established in *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532 (1994), and *Chaparro v. Carnival Corp.,* 693 F.3d 1333 (11th Cir. 2012).

186.   At all times material hereto, RCCL owed Michael O'Brien a duty of reasonable care as a fare-paying passenger aboard the *Harmony of the Seas*. This duty included compliance with ACEP Guidelines as mandated by 46 U.S.C. § 3509, which requires functional diagnostic equipment including X-ray machines, blood testing capability, adequate oxygen supplies, and proper respiratory treatment equipment including appropriately-sized nebulizer masks for emergency medical care.

187.   RCCL breached its duties through violations of 46 U.S.C. § 3509. On September 24, 2022, Captain Johnny Faevelen requested Coast Guard helicopters "bring oxygen" due to depleted supplies and authorized two medical evacuations due to equipment failures. Despite this knowledge, RCCL embarked the O'Brien family on September 25, 2022, without disclosing or remedying these federal violations. During Bobbie O'Brien's medical crisis, RCCL's violations of § 3509 persisted: non-functional X-ray equipment preventing pneumonia diagnosis, broken blood testing equipment preventing infection detection, depleted oxygen supplies requiring rationing between patients, and nebulizer equipment lacking proper mask sizes, forcing Michael's daughter to manually hold an adult mask against her mother's face because medical staff lacked appropriate equipment for respiratory treatment.

188.   Michael O'Brien was placed directly within the zone of immediate physical danger created by RCCL's federal safety violations. For approximately 72 hours, he shared a confined cabin with his COVID-positive wife, providing intimate

a. failing to maintain functional X-ray equipment necessary for diagnosing respiratory conditions;

b. failing to maintain operational blood testing equipment;

c. failing to maintain adequate oxygen supplies, resulting in Bobbie suffering without oxygen for critical periods;

d. failing to investigate or remedy known equipment failures following the September 24th evacuations;

e. failing to provide medical evacuation despite knowledge of the facility's inadequacy;

f. failing to warn passengers that the medical facility lacked basic diagnostic capabilities despite knowing passengers relied on these representations during COVID-19;

g. operating medical facilities with equipment so fundamentally compromised that Bobbie's pulse oximeter showed 98% oxygen saturation when she was actually experiencing life-threatening hypoxemia at 89-91%, a false reading that delayed critical oxygen therapy; and

h. failing to increase vessel speed or take any remedial action following the ALPHA ALPHA ALPHA medical emergency announcement at 1:30 AM on October 2nd.

182. Alternatively, *res ipsa loquitur* applies because:

a. the simultaneous failure of multiple independent medical systems does not occur absent negligence;

b. RCCL had exclusive control over the medical facility; and

c. Bobbie did not contribute to the equipment failures.

Under *res ipsa loquitur,* the jury may infer negligence from the circumstances alone, as the simultaneous failure of every major medical system—X-ray, blood

caregiving including physical support during respiratory distress. Had RCCL maintained functional diagnostic equipment as required by § 3509, Bobbie's pneumonia would have been diagnosed October 1st, preventing Michael's prolonged exposure. Instead, RCCL's equipment failures forced Michael to provide intimate care in a contaminated environment without proper protective equipment. This prolonged exposure in close quarters resulted in Michael contracting COVID-19. Ship medical records will reflect his repeated presence in the medical facility during Bobbie's treatment, further exposing him to the virus in confined spaces. He was thus trapped at sea, infected with a potentially fatal virus he contracted due to RCCL's violations, on a vessel that could not provide federally-mandated emergency care.

189.   Michael O'Brien has been married to Bobbie for over thirty years. He witnessed her deterioration from mild symptoms on September 30th to life-threatening respiratory failure by October 2nd—deterioration directly caused by RCCL's federal safety violations. He observed her struggle to breathe while medical staff could not perform diagnostics required by § 3509 and ACEP Guidelines. He watched his daughter Mychael—who herself suffers from cystic fibrosis, a serious respiratory condition—manually hold an improperly-sized nebulizer mask to his wife's face because RCCL lacked proper respiratory equipment. He was present when staff discovered oxygen supplies were depleted in violation of § 3509, forcing them to manually alternate a single oxygen source between his wife and another patient. At approximately 1:30 AM on October 2nd, he heard the ship-wide ALPHA ALPHA ALPHA medical emergency announcement while his wife lay without oxygen. Cape Canaveral Hospital records confirm Bobbie arrived in life-threatening respiratory failure with oxygen saturation of 88-89%—levels requiring immediate emergency

intervention. Medical literature establishes that sustained oxygen saturation below 90% causes organ damage and can rapidly progress to respiratory arrest. Michael watched his wife endure this life-threatening condition for hours aboard ship while RCCL's broken equipment prevented diagnosis or proper treatment.

190.   While Michael O'Brien has physically recovered from the COVID-19 infection he contracted while caring for Bobbie, he has not recovered from the trauma of witnessing his wife's near-death caused by RCCL's federal safety violations. As a direct and proximate result of watching his wife suffer life-threatening respiratory failure due to broken medical equipment — not from COVID itself — Michael has experienced severe and ongoing physical manifestations of emotional distress. Since October 2022, these have included:

   a.   persistent sleep disruption affecting daily functioning; intrusive recollections of watching his wife unable to breathe while equipment failed;

   b.   hypervigilance regarding his own health, resulting in significantly increased medical appointments and constant health monitoring since witnessing Bobbie's near-death experience;

   c.   avoidance behaviors limited to cruise-related activities and maritime travel; and

   d.   physical symptoms associated with sustained anxiety including documented weight changes, gastrointestinal issues, and elevated blood pressure.

191.   These manifestations stem not from his own illness, which resolved, but from the trauma of witnessing RCCL's equipment failures nearly kill his wife. These symptoms have continued for over two years, affecting his work, relationships,

and daily activities. The ongoing nature of this emotional distress, distinct from any COVID-related effects, will be established through medical documentation during discovery.

192.    The trauma extended beyond the cruise. For several months following Bobbie's near-death experience, she required extensive bed rest and round-the-clock care from all four family members. Mike became a full-time caregiver to his traumatized wife, watching her struggle with basic activities she'd performed independently for decades. This prolonged caregiving, necessitated by RCCL's negligence, deepened his emotional distress and physical exhaustion.

193.    The foreseeability of spousal trauma was evident. RCCL knew from the September 24th evacuations that the vessel's medical equipment violated § 3509's ACEP Guidelines and could not handle respiratory emergencies. By concealing these deficiencies and sailing September 25th, RCCL knew or should have known that passengers with medical emergencies would suffer without adequate care while their family members watched helplessly—precisely what Michael O'Brien experienced when he witnessed his wife's respiratory crisis aboard a vessel lacking federally-required medical capabilities.

**WHEREFORE,** Plaintiff MICHAEL O'BRIEN demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT X – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ROYAL CARIBBEAN CRUISES LTD. FOR DAMAGES TO MEGHAN O'BRIEN

Plaintiff MEGHAN O'BRIEN re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

194. This Count is brought by Meghan O'Brien under general maritime law for negligent infliction of emotional distress arising from RCCL's violations of federal safety requirements. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, 46 U.S.C. § 30527 voids any contractual provision limiting liability for personal injury caused by negligence. The framework for this claim is established in *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532 (1994), and *Chaparro v. Carnival Corp.*, 693 F.3d 1333 (11th Cir. 2012).

195. At all times material hereto, RCCL owed Meghan O'Brien a duty of reasonable care as a fare-paying passenger aboard the *Harmony of the Seas*. This duty included compliance with ACEP Guidelines as mandated by 46 U.S.C. § 3509, which requires functional diagnostic equipment including X-ray machines, blood testing capability, and adequate oxygen supplies for emergency medical care.

196. RCCL breached its duties through violations of 46 U.S.C. § 3509 as detailed in prior counts. Despite knowing from the September 24th evacuations that medical equipment was non-functional and oxygen supplies depleted, RCCL embarked the O'Brien family on September 25, 2022, without disclosure or remedy of these deficiencies.

197. Meghan O'Brien was placed directly within the zone of immediate physical danger. She was:

    a.  exposed to COVID-19 through sharing a cabin with her COVID-positive parents throughout the voyage, resulting in constant exposure in confined quarters;

    b.  present in the ship's medical facility for extended periods, witnessing the chaos as staff rushed to treat her mother with inadequate equipment, including attempts to administer nebulizer treatments through an ill-fitting mask that could not properly deliver medication;

    c.  providing direct physical care during nebulizer treatments, including collecting and disposing of contaminated tissues containing respiratory secretions her mother coughed up during the aerosolizing procedure;

    d.  witness to repeated equipment failures, present as medical staff drew her mother's blood three separate times because, as Nurse Magdaragog stated, "our blood processing machines aren't working," watching her mother endure multiple needle sticks while the hemolyzed samples remained unusable for hours; and

    e.  the direct recipient of Dr. Garrido's chilling statement that Bobbie "wouldn't make it" to Orlando Hospital—she needed immediate transport to Port Canaveral, the closest facility.

198.    This moment—a ship's doctor confirming her mother was too critical to survive a 30-minute transport—crystallized the severity of RCCL's equipment failures. Meghan's military training as a United States Naval officer gave her professional understanding that the scene unfolding before her represented a catastrophic system failure threatening her mother's life.

199.    Meghan witnessed her mother's progression from mild symptoms to life-threatening respiratory failure. Her Navy training heightened her understanding of the severity—she understood that hypoxia causes brain

damage and death, recognized that prolonged dehydration (her mother went over 24 hours without drinking liquids) leads to major medical problems, understood that broken diagnostic equipment meant no treatment options, and comprehended the life-threatening implications of rationing oxygen between patients. She watched from the vessel's balcony as six ambulances waited at Port Canaveral—visual confirmation of the mass casualty event RCCL's negligence had created. Throughout the crisis, she was repeatedly forced to leave her mother's side to handle critical logistics: coordinating with family members, ensuring their stateroom was packed and ready for disembarkation to avoid penalties, managing travel arrangements, and caring for her young extended family members, ages five and three, who were terrified by their "Grandma O'Bobbie's" deteriorating condition. This constant pull between her dying mother's bedside and essential family responsibilities created additional trauma.

200.    As a direct and proximate result of being placed in the zone of danger and witnessing her mother's near-death caused by RCCL's federal safety violations, Meghan has suffered severe and ongoing physical manifestations of emotional distress. Meghan had pre-existing PTSD from her military service that was clinically diagnosed and under management prior to the cruise. Since October 2022, the cruise trauma has caused documented exacerbation of her PTSD symptoms including:

    a.  new cruise-related nightmares distinct from her service-related trauma;

    b.  panic attacks triggered by cruise-related stimuli;

    c.  exacerbation of chronic sleep dysfunction, with new cruise-specific intrusive thoughts during the limited rest periods she does achieve;

     d.  hypervigilance and heightened startle response exceeding pre-cruise levels; and

     e.  avoidance behaviors related to medical settings and maritime travel.

201.    Additionally, she has endured the secondary trauma of witnessing her mother develop PTSD as a result of RCCL's negligence. These exacerbated symptoms have persisted for over two years, requiring increased treatment and impacting her daily functioning beyond her pre-cruise baseline. Medical documentation comparing her pre-cruise and post-cruise PTSD symptoms, along with expert testimony regarding the exacerbation caused by RCCL's conduct, will be established at trial.

202.    Following the cruise, Meghan's trauma was compounded by months of caregiving responsibilities. Despite working full-time as a first responder health coach and nonprofit executive, she provided extensive care for her bedridden mother, sacrificing professional opportunities and personal time. The burden of balancing employment with caregiving—made necessary by RCCL's negligence—exacerbated her PTSD symptoms and created additional physical and emotional strain.

203.    The convergence of Meghan's military training, her role as primary caregiver, her own COVID exposure, and her responsibility for traumatized children while her mother faced death created a perfect storm of trauma—all directly caused by RCCL's decision to sail with equipment they knew violated federal law. Her professional background made her uniquely aware that her mother was dying from preventable causes due to equipment failures that would never be tolerated in reputable maritime operations.

    **WHEREFORE,** Plaintiff MEGHAN O'BRIEN demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages

recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT XI – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ROYAL CARIBBEAN CRUISES LTD. FOR DAMAGES TO MYCHAEL O'BRIEN LABRECQUE

Plaintiff MYCHAEL O'BRIEN LABRECQUE re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

204.   This Count is brought by Mychael O'Brien LaBrecque under general maritime law for negligent infliction of emotional distress arising from RCCL's violations of federal safety requirements. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, 46 U.S.C. § 30527 voids any contractual provision limiting liability for personal injury caused by negligence. The framework for this claim is established in *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532 (1994), and *Chaparro v. Carnival Corp.*, 693 F.3d 1333 (11th Cir. 2012).

205.   At all times material hereto, RCCL owed Mychael O'Brien LaBrecque a duty of reasonable care as a fare-paying passenger aboard the *Harmony of the Seas*. This duty included compliance with ACEP Guidelines as mandated by 46 U.S.C. § 3509, which requires functional diagnostic equipment and adequate oxygen supplies for emergency medical care. RCCL's failure to maintain such equipment created exceptional danger for passengers with respiratory conditions like Mychael's cystic fibrosis.

206.   Like any passenger with a medical condition, Mychael O'Brien LaBrecque made a calculated risk assessment before boarding. She reasonably

assumed—based on RCCL's advertising, federal requirements, industry standards, and specific assurances from RCCL's concierge staff—that the ship would maintain basic functional medical equipment. On September 19, 2022, just six days before embarkation, RCCL's Suite Concierges sent an email to the O'Brien family promising "Your health & safety are our top priority" and directing them to RCCL's health protocols that would "ensure you have a safe and healthy experience with us" (Exhibit F). Five days after sending these safety assurances, on September 24th, Captain Johnny requested Coast Guard helicopters "bring oxygen" due to depleted supplies and authorized two medical evacuations. Yet RCCL never withdrew their safety promises or warned passengers. Mychael accepted the inherent risks of being at sea with cystic fibrosis based on these explicit safety assurances, but she did NOT and could NOT assume the risk that RCCL was operating in violation of federal statutes with equipment they knew was broken. No passenger assumes the risk of boarding a vessel that violates federal safety laws—especially when the cruise line is actively promising a "safe and healthy experience."

207.    RCCL breached its duties through violations of 46 U.S.C. § 3509 as detailed in prior counts. By sailing with non-functional diagnostic equipment and depleted oxygen supplies after the September 24th evacuations, RCCL consciously disregarded the potentially fatal risk to passengers with respiratory conditions.

208.    Mychael O'Brien LaBrecque faced immediate, life-threatening danger unique among the plaintiffs. Cystic fibrosis causes thick mucus buildup in the lungs, making respiratory infections potentially fatal. COVID-19 poses extreme danger to CF patients, with mortality rates exponentially higher than the general population.

209.    Mychael's presence was not voluntary assumption of risk but a foreseeable consequence of RCCL's negligence. Under the doctrine of "danger invites rescue," when RCCL's broken equipment left Bobbie without adequate medical care, it was entirely foreseeable that family members would be compelled to provide care. RCCL cannot create dangerous conditions through federal safety violations, then claim family members "chose" to enter the zone of danger when providing care made necessary by RCCL's failures. Mychael faced an impossible decision: abandon her dying mother or risk her own life.

210.    Through RCCL's negligence, Mychael herself was placed in the zone of immediate physical danger. She was:

   a.  exposed to COVID-19 through prolonged contact with her infected mother, including holding the nebulizer mask directly on Bobbie's face in the infirmary—a procedure Mychael understood from her lifetime of CF treatment created aerosol transmission of respiratory droplets;

   b.  present in her parents' cabin multiple times daily during Bobbie's infectious period;

   c.  present during the medical crisis, witnessing the complete failure of respiratory support systems she might need for survival; and

   d.  trapped on a vessel she now knew could not provide life-saving care if she contracted the virus.

211.    The broken X-ray machine meant pneumonia—a common, life-threatening CF complication—could not be diagnosed. The depleted oxygen meant respiratory support would be unavailable if Mychael's lungs, already compromised by CF, required supplementation. The non-functional blood testing meant infection markers and electrolyte imbalances critical to CF management

could not be detected. RCCL created these dangerous conditions, making family caregiving both necessary and foreseeably dangerous.

212.    Mychael experienced the unique trauma of watching her mother nearly die from a respiratory infection while knowing the same infection could kill her due to her cystic fibrosis. She witnessed her mother's oxygen deprivation while knowing her own compromised lungs made her exponentially more vulnerable. She observed the medical facility's complete breakdown while understanding that as a CF patient, she depended absolutely on functional medical equipment for survival. Every moment caring for her mother was a moment risking her own life—a Sophie's choice between abandoning her dying mother or risking leaving her newlywed husband a widower.

213.    As a direct and proximate result of being placed in the zone of danger and witnessing her mother's near-death while facing her own potential mortality, Mychael has suffered severe and ongoing physical manifestations of emotional distress. Since October 2022, these have included:

    a.  documented anxiety and panic attacks with respiratory components particularly traumatic for a CF patient;

    b.  severe sleep disturbances affecting immune function critical for CF management;

    c.  exacerbation of CF-related digestive symptoms;

    d.  compulsive hygiene behaviors including excessive hand sanitization and contamination fears that interfere with daily activities;

    e.  persistent fear-based hypervigilance regarding respiratory infections requiring psychological intervention; and

    f.  avoidance behaviors that complicate her ongoing CF treatment and monitoring.

214.    These compulsive behaviors—which intensified dramatically after the cruise—represent her attempt to control infection risk after experiencing how quickly RCCL's failures could prove fatal to someone with her condition. These symptoms have persisted for over two years and have complicated her underlying condition management. Medical documentation from her cystic fibrosis treatment team and expert testimony regarding how trauma-induced stress impacts CF patients will be provided at trial.

215.    The impact on Mychael extended far beyond the cruise. Despite her own CF requiring careful health management and working full-time, she spent months caring for her bedridden mother. This caregiving burden, while exposing her to continued infection risk and physical exhaustion, was a direct consequence of RCCL's negligence. The professional impact was severe: Mychael had started a new position shortly before the cruise, and her necessary focus on her mother's life-threatening condition created immediate conflict with the company's owner. Without the buffer of middle management, she faced direct pressure from ownership about her divided attention, received negative feedback about her availability during her mother's medical crisis, and was made to feel her job was in jeopardy for prioritizing her dying mother's care. The stress of potentially losing her new job while caring for her mother—with the company owner personally expressing dissatisfaction—all while managing her own CF, compounded the trauma from the cruise.

216.    RCCL's willful and wanton negligence created an unconscionable situation where a passenger with a documented life-threatening respiratory condition was forced to choose between caring for her dying mother and protecting her own life, all because RCCL chose profits over safety by sailing with equipment they knew violated federal law.

**WHEREFORE,** Plaintiff MYCHAEL O'BRIEN LABRECQUE demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

## COUNT XII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ROYAL CARIBBEAN CRUISES LTD. FOR DAMAGES TO MICHAEL LABRECQUE

Plaintiff MICHAEL LABRECQUE re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through one hundred twelve (112) as though alleged originally herein.

217.    This Count is brought by Michael LaBrecque under general maritime law for negligent infliction of emotional distress arising from RCCL's violations of federal safety requirements. This claim is timely filed within the three-year federal statute of limitations under 46 U.S.C. § 30106. While RCCL's passenger ticket contract purports to require suit within one year, 46 U.S.C. § 30527 voids any contractual provision limiting liability for personal injury caused by negligence. The framework for this claim is established in *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532 (1994), and *Chaparro v. Carnival Corp.,* 693 F.3d 1333 (11th Cir. 2012).

218.    At all times material hereto, RCCL owed Michael LaBrecque a duty of reasonable care as a fare-paying passenger aboard the *Harmony of the Seas.* This duty included compliance with ACEP Guidelines as mandated by 46 U.S.C. § 3509.

219.    RCCL breached its duties through violations of 46 U.S.C. § 3509 as detailed in prior counts. Despite knowing from the September 24th evacuations that medical equipment was non-functional and oxygen supplies depleted, RCCL embarked

the LaBrecque and O'Brien families on September 25, 2022, without disclosure or remedy of these deficiencies.

220.    Michael LaBrecque was placed directly within the zone of immediate physical danger through multiple exposures. He provided direct care to his COVID-positive mother-in-law, spending extensive time in her cabin and the medical facility during her infectious period. He maintained an overnight vigil in the medical facility's confined space with active virus transmission. At approximately 2:00 AM on October 2, 2022, thirty minutes after the ship-wide ALPHA ALPHA ALPHA emergency, Michael LaBrecque noticed the mechanical silence where Bobbie's oxygen flow should have been audible. Checking the flow meter, he found it reading zero. When he alerted staff, they discovered that every single oxygen tank in the medical facility was empty. For the next thirty minutes—a period sufficient to cause permanent organ damage—Bobbie remained without any oxygen while medical staff frantically searched the facility for a functioning tank. During this crisis, Michael physically supported Bobbie's body, helping position her to ease breathing while feeling her respiratory distress through direct contact. When staff finally located one functioning tank at approximately 2:30 AM, he witnessed them manually rationing this single oxygen source between Bobbie and a cardiac patient, switching the supply every few minutes in a desperate attempt to keep both alive.

221.    Michael LaBrecque's 2:00 AM discovery represents unique trauma because he became the unwitting investigator of RCCL's negligence. While other family members were providing care or managing logistics, Michael was the one who uncovered the equipment failure that nearly killed two passengers. His discovery transformed him from concerned son-in-law to the person whose vigilance potentially saved lives. His finding validated Captain Johnny's September 24th

request for the Coast Guard to "bring oxygen"—proving RCCL knew about and concealed systematic oxygen depletion. The connection between his discovery and the Captain's earlier warning, which Michael would later learn about, demonstrated that RCCL had deliberately endangered passengers by sailing with known oxygen deficiencies.

222.   Michael LaBrecque experienced dual psychological trauma unique to his position as Mychael's spouse. While witnessing his mother-in-law's respiratory crisis, he simultaneously faced the intimate terror of potentially losing his wife. As her husband and life partner, he carried the specific weight of knowing he could become a widower just months after their wedding. The oxygen failure he discovered meant that if Mychael contracted COVID and needed respiratory support—a common CF requirement—none would be available. While the entire family feared for Mychael given her cystic fibrosis, Michael uniquely faced the possibility of losing both his mother-in-law and his new bride to RCCL's negligence. During this crisis, Michael and Mychael LaBrecque repeatedly pleaded with RCCL's concierge staff for medical intervention, but were told nothing more could be done, despite the life-threatening emergency unfolding before them.

223.   As a direct and proximate result of discovering the life-support failure while fearing for multiple family members' lives, Michael LaBrecque has suffered severe and ongoing physical manifestations of emotional distress. Since October 2022, these have included:

   a.   documented weight loss of approximately thirty pounds due to stress-related appetite changes and gastrointestinal distress;

   b.   onset of chronic back pain beginning October 2022, requiring regular chiropractic care, with stress-related muscle tension and spasms

interfering with his ability to maintain work positions for extended periods;

c.  recurring nightmares specifically featuring medical equipment failures and the image of empty oxygen tanks;

d.  intrusive memories of the 2:00 AM discovery that interrupt daily functioning;

e.  persistent insomnia and sleep disruption;

f.  hypervigilance regarding family members' health; and

g.  additional physical symptoms of sustained anxiety including tension headaches and cardiovascular symptoms.

224.  These manifestations have disrupted his personal and professional life for well over two years. Medical documentation and expert testimony establishing these physical manifestations and their connection to RCCL's conduct will be provided at trial.

225.  The trauma continued for months post-cruise as Bobbie required extensive bed rest and round-the-clock care. Michael LaBrecque, while maintaining full-time employment, became part of a rotating caregiving team with his wife and in-laws. The professional strain of balancing work obligations with his mother-in-law's care needs—attending medical appointments, providing physical assistance, managing medications—created ongoing stress that manifested in his thirty-pound weight loss, chronic back pain, and work performance issues. This months-long caregiving burden, necessitated entirely by RCCL's negligence, extended and deepened the trauma far beyond the cruise itself.

226.   Michael LaBrecque's role as the person who discovered the smoking gun of RCCL's negligence—empty oxygen tanks that Captain Johnny had warned about on September 24th—while simultaneously fearing his wife with cystic fibrosis could die from the same equipment failures creates a unique basis for emotional distress damages.

**WHEREFORE,** Plaintiff MICHAEL LABRECQUE demands judgment against Defendant ROYAL CARIBBEAN CRUISES LTD. for all compensatory damages recoverable under the law; punitive damages as permitted by law; pre and post-judgment interest; costs of suit; and demands trial by jury.

DATED this 23rd day of September, 2025.

Respectfully Submitted,

MEGHAN O'BRIEN, Pro Se
212 Whitestone Drive
Canton, GA 30115
Phone: (770) 655-7244
Email: mobrie19@alumni.nd.edu

ROBERTA "BOBBIE" O'BRIEN, Pro Se

MICHAEL O'BRIEN, Pro Se

MYCHAEL O'BRIEN LABRECQUE, Pro Se

MICHAEL LABRECQUE, Pro Se

- 81 -



**edium Box**

**11" x 3")**

Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating
Material Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology
were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.



MEGHAN O BRIEN
(770) 655-7244
THE UPS STORE #5783
STE 501
880 BIRMINGHAM RD
MILTON GA 30004-4421

5 LBS          1 OF 1

SHIP WT: 5 LBS
DATE: 23 SEP 2025          D.C.



SHIP MIAMI DIVISION
TO: (305) 523-5100
U.S. SOUTHERN DISTRICT COURT, FL
CLERK S OFFICE, ROOM 150
400 NORTH MIAMI AVE
MIAMI FL 33128

SEP 24 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## FL 330 6-03



UPS EARLY          1+

TRACKING #: 1Z 45W 9R4 15 8534 5404

BILLING: P/P



REF #1: SM



MMPFCZPMCBN68 ISH 13.00C 2ZP 450 34.5U 08/2025

SEE NOTICE ON REVERSE regarding UPS Terms and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and
customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration
Regulations. Diversion contrary to law is prohibited.



